UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICA FIRST LEGAL FOUNDATION,

    *Plaintiff,*

          v.

FEDERAL BUREAU OF INVESTIGATION,
*et al.,*

    *Defendants.*

Civil Action No. 23-2172 (BAH)

## <u>DECLARATION OF MICHAEL G. SEIDEL</u>

I, Michael G. Seidel, declare as follows:

1.      I am the Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division, Federal Bureau of Investigation (FBI), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit, from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of the General Counsel, Freedom of Information Act (FOIA) Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act (FOIPA) litigation cases nationwide. Prior to joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration (DEA), from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various

1

assignments from 1994 to September 2006 culminating in my assignment as Chief, General

Litigation Branch, U.S. Army Litigation Division, where I oversaw FOIPA litigation for the U.S.

Army. I am an attorney licensed in the State of Ohio and the District of Columbia.

     2.      In my official capacity as Section Chief of RIDS, I supervise approximately 239

FBI employees, supported by approximately 104 contractors, who staff a total of nine (9) Federal

Bureau of Investigation Headquarters (FBIHQ) units and two (2) field operational service center

units whose collective mission is to effectively plan, develop, direct, and manage responses to

requests for access to FBI records and information pursuant to the FOIA as amended by the

OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act

of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and

FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.

My responsibilities also include the review of FBI information for classification purposes as

mandated by Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010) and the preparation of

declarations in support of Exemption 1 claims asserted under the FOIA. The Attorney General of

the United States has designated the Section Chief, RIDS, as an original classification authority

and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1. The

statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

     3.      Because of the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.

Specifically, I am aware of the FBI's handling of Plaintiff's FOIA request that is the subject of

this litigation.

4.        The FBI submits this declaration in support of Defendant's Motion for Summary Judgment. Part I of this declaration provides the Court with a summary of the administrative history of Plaintiff's request. Part II of this declaration provides a description of the FBI's recordkeeping system and the procedures used to search for and review records subject to the FOIA and responsive to Plaintiff's request. Part III provides the FBI's justification for non-disclosure of withheld records or information under the FOIA.

## PART I: ADMINISTRATIVE HISTORY OF PLAINTIFF'S REQUEST

### FBI FOIPA REQUEST NUMBER 1578086-000

5.        By electronic FOIA ("eFOIA")[1] dated January 6, 2023, Plaintiff submitted a FOIA request to the FBI seeking records pertaining to the FBI Background Investigation of Alejandro Mayorkas for Senate Confirmation as United States Secretary of Homeland Security. Specifically, Plaintiff requested:

1) All records and versions of the FBI background investigation, Form SF-86 and any supporting security clearance documentation, including waiver forms, that were both completed, regardless of completion date(s), by Alejandro Mayorkas or his designees for the purposes of allowing the FBI to conduct a background investigation as part of his nomination for Secretary of Homeland Security and as produced to or shared with Senate Homeland Security and Governmental Affairs majority staff or any other congressional staff.

2) All records and versions of the FBI background investigation, Form SF-86 and any supporting security clearance documentation, including waiver forms, that were both completed, regardless of completion date(s), by Alejandro Mayorkas or his designees for the purposes of allowing the FBI to conduct a background investigation as part of his nomination for Deputy Secretary of Homeland Security and as produced to or shared with Senate Homeland Security and Governmental Affairs majority staff or any other congressional staff.

---

[1] An eFOIA is an electronic means by which requesters can submit FOIA requests to the FBI, online, through the FBI's public website, www.FBI.gov.

3) All records and versions of the FBI background investigation, Form SF-86 and any supporting security clearance documentation, including waiver forms, that were both completed, regardless of completion date(s), by Alejandro Mayorkas or his designees for the purposes of allowing the FBI to conduct a background investigation as part of his nomination for Director of the United States Citizenship and Immigration Service and as produced to or shared with Senate Homeland Security and Governmental Affairs majority staff or any other congressional staff.

4) All records and versions of the FBI background investigation, Form SF-86 and any supporting security clearance documentation, including waiver forms, that were both completed, regardless of completion date(s), by Alejandro Mayorkas or his designees for the purposes of allowing the FBI to conduct a background investigation as part of his nomination for United States Attorney for the Central District of California and as produced to or shared with Senate Homeland Security and Governmental Affairs majority staff or any other congressional staff.

Plaintiff requested expedited processing based on a compelling need to urgently inform the public about an actual or alleged federal government activity by a person primarily engaged in disseminating information. Plaintiff also requested a waiver of search and duplication fees. (**Ex. A.**)

6.    By letter dated January 13, 2023, the FBI informed Plaintiff of the following:  it had completed its search for records responsive to his request; the records requested were categorically denied pursuant to FOIA Exemptions 6 and 7(C), 5. U.S.C. §§ (b)(6) and (b)(7)(C); Plaintiff did not sufficiently demonstrate that the public's interest in disclosure (relating to the operations and activities of the government) outweigh the personal privacy interests of these individual; and that although the FBI acknowledges the existence of records, the records are exempt from disclosure as processing these third party records would constitute an unwarranted invasion of personal privacy. Additionally, the FBI advised it was closing Plaintiff's request. The FBI instructed Plaintiff to visit ww.fbi.gov, select "Services," "Information Management," and "Freedom of Information/Privacy Act" for more information about making requests for records on third party individuals (living or deceased). Finally, the FBI informed Plaintiff it could appeal

the FBI's response to the Department of Justice (DOJ), Office of Information Policy (OIP) within ninety (90) days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting the DOJ, Office of Government Information Services (OGIS). **(Ex. B.)**

      7.     By letter dated April 14, 2023, Plaintiff submitted an appeal to OIP challenging the FBI's denial of records based on the personal privacy interest of Secretary Mayorkas outweighing the public interest in disclosure **(Ex. C.)**

      8.     By letter dated April 13, 2023, OIP acknowledged receipt of Plaintiff's appeal and informed Plaintiff OIP assigned appeal number A-2023-01067 to his appeal. **(Ex. D.)**

      9.     By letter dated June 16, 2023, OIP informed Plaintiff it was affirming the FBI's actions in response to Plaintiff's FOIPA Request Number 1578086-000; therefore, OIP was closing Plaintiff's appeal. OIP explained that to the extent that non-public responsive records exist, disclosure of such records, including law enforcement records, concerning a third-party individual would constitute a clearly unwarranted invasion of personal privacy, and could reasonably be expected to constitute an unwarranted invasion of personal privacy. See 5 U.S.C. § 552(b)(6), (7)(C). OIP advised Plaintiffs if he was dissatisfied with the action on his appeal, Plaintiffs could file a lawsuit in federal district court, or seek mediation services from OGIS. **(Ex. E.)**

      10.    On July 29, 2023, Plaintiff filed his complaint with the United States District Court for the District of Columbia. (ECF No. 1.)

FBI'S ACTIONS TAKEN DURING LITIGATION

      11.    By letter dated March 29, 2024, the FBI advised Plaintiff that it had completed its review of responsive records for applicable underlying exemptions as well as segregability. The

FBI informed Plaintiff that it identified 115 pages of segregable, public source information which were being released in full or part. The FBI's letter advised that all other material is categorically exempt from disclosure pursuant to FOIA Exemptions 6 and 7(C), 5. U.S.C. §§ (b)(6) and (b)(7)(C), and underlying FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E), 5 U.S.C. §§ (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).[2] Lastly, the FBI advised Plaintiff that he could appeal the FBI's response to OIP, within ninety (90) days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. **(Ex. F.)**

## PART II: THE FBI'S CENTRAL RECORDS SYSTEM AND SEARCH METHODOLOGY

12. Plaintiff's request seeks records on the FBI's background investigations of Alejandro Mayorkas, a subject reasonably expected to be indexed within the automated indices of the FBI's Central Records System (CRS). Given the comprehensive nature of the information contained therein (*see* ¶ 13, *infra*), the CRS is the FBI system of records where responsive records would reasonably be expected to be found.

### THE FBI'S CENTRAL RECORDS SYSTEM

13. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI while fulfilling its mission and integrated functions as a law enforcement and intelligence agency, and in the fulfillment of its administrative and personnel functions. The CRS spans the

---

[2] The FBI acknowledges that it did not cite FOIA Exemption 5 in its letter to Plaintiff dated March 29, 2024. However, the FBI is now asserting that the documents responsive to this request are categorically exempt from disclosure pursuant to FOIA Exemption 5.

entire FBI organization and encompasses the records of FBIHQ, FBI field offices, and FBI legal attaché offices worldwide.

14.     The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subjects. The broad array of CRS file classification categories includes types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number consisting of three sequential components: (a) the CRS file classification number; (b) the abbreviation of the FBI office of origin (OO) opening the file; and (c) the assigned individual case file number for the particular subject matter.[3] Within each case file, pertinent documents of interest are "serialized," or assigned a number in the order which the document is added to the file, typically in chronological order.

*The Central Records System's General Indices and Indexing*

15.     The general indices to the CRS, comparable to a digital version of a library card catalog, function as the key to locating records within the enormous amount of information contained in the CRS. FBI personnel index information in the CRS by individual (person), organization (entity, place, or thing), or activity or event (e.g., terrorist attack or bank robbery)

---

[3] For example, in fictitious file number "11Z-HQ-56789," "11Z" indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI office of origin or "OO", and "56789" indicates the assigned case specific file number.

when information is deemed of sufficient significance to warrant indexing for future retrieval.[4]
The entries in the general indices fall into two categories:

    A.    <u>Main index entry</u>: A main index entry is created for each individual or non-individual (e.g., organization, event, or activity) that is the subject or focus of an investigation. Main subjects are identified in the case title of a file.

    B.    <u>Reference index entry</u>: A reference index entry is created for an individual or non-individual (e.g., organization, event, or activity) associated with an investigation, but who or which is not the main subject or focus of the investigation. Reference subjects are typically not identified in the case title of a file.

*Sentinel*

16.    FBI personnel access the general indices through Sentinel, the FBI's case management system (since July 1, 2012). Prior to Sentinel, the FBI relied on a case management system known as Automated Case Support (ACS).[5] On August 1, 2018, the FBI decommissioned

---

[4] The FBI's Records Management Policy mandates that FBI personnel enter all federal records into an authorized FBI recordkeeping system. FBI personnel are responsible for managing records they create and receive, determining the record status for each potential record, and importing records into an electronic recordkeeping system. *See* FBI Records and Information Management Policy Guide, 1223PG (September 22, 2022) at pp. 11-12 and 25-28 (Sections 2.9 and 4.2.3) available at https://vault.fbi.gov/records-and-information-management-policy-guide-1223pg/records-and-information-management-policy-guide-1223pg/view (last accessed on July 25, 2024).

[5] As part of the ACS implementation process, over 105 million pre-existing CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. Prior to the implementation of ACS, the FBI relied on manual indices to the CRS, which originally consisted of 3"x 5" paper index cards, filed alphabetically based on subject matter (individual, event, organization, or other topic of investigative or administrative interest to the FBI) and housed across the FBI in various

ACS and the ACS indexed data was migrated into Sentinel, where these indices are accessible and searchable through Sentinel's search function. In addition to providing access to the information previously indexed into ACS, Sentinel provides a means for FBI personnel to access the FBI's older manual indices, when necessary.

17.    FBI personnel rely on Sentinel to locate records and other types of documents to fulfill essential functions, such as: conducting criminal, counterterrorism, and national security investigations; conducting background investigations; performing citizenship and employment queries; and administering security screenings, to include presidential protection. Sentinel's index search methodology and function allow FBI personnel to query the CRS for indexed subjects in case files.

18.    However, the identification of records indexed to the subject of a FOIPA request does not automatically mean the indexed records are responsive. Index searches using the search functions available in Sentinel are the means by which potentially responsive records are located, but ultimately, a FOIPA analyst must review potentially responsive records against the specific parameters of individual requests. Responsiveness determinations are made once indexed records are gathered, analyzed, and sorted by FOIPA analysts who then make informed scoping decisions to determine the total pool of records responsive to an individual request.

---

locations. The index cards contained the subject of interest and the file number(s) where the subject's information was located. The FBI's 1995 ACS consolidation did not capture all the FBI's manual indices and, as a result, not all the FBI's manual indices migrated with ACS into Sentinel in August 2018. Instead, the manual indices were digitized, using optical character recognition technology, and Sentinel provides a conduit to access and search the manual indices electronically.

ADEQUACY OF SEARCH

*Central Records System Search and Results*

19.      The FBI determined that a search of the CRS automated indices, available within

Sentinel via the Sentinel and ACS search function and the Manual indices, accessed via Sentinel,

represented the most reasonable means for the FBI to locate records potentially responsive to

Plaintiff's FOIA request. This is because, as described above, these general indices provide

access to a comprehensive, agency-wide set of indexed data on a broad array of investigative and

administrative subjects and consist of millions of searchable records that are updated daily with

newly indexed information.

20.      In response to Plaintiff's request, the FBI conducted a search for main entries[6] in

the Sentinel, and ACS via Sentinel's search function. The FBI searched the indices using the

following term: "Alejandro Mayorkas" employing a search cut-off date[7] of September 22, 2023,

which is the date of the FBI's initial search for records. The FBI located responsive records as a

result of this search.

21.      Plaintiff has provided no information for the FBI to reasonably conclude that

records responsive under the FOIA would reside outside the CRS. There is no indication from

the CRS search efforts that responsive records would reside in any other FBI system or location.

Thus, the FBI has searched all locations and files reasonably likely to contain responsive records,

---

[6] *See* ¶ 15, *supra*, for an explanation of main entries.

[7] A search cut-off date is the date that the agency commences a search for records responsive to a
FOIPA request. Generally, the FBI uses a search cut-off date to delineate the scope of a FOIPA
request by treating records created after that date as not responsive to the request. *See* 28 C.F.R.
§ 16.4(a). The DOJ provides notice of the use of a search cut-off date in its published FOIA
reference guide on its FOIA website (https://www.justice.gov/oip/doj-guide-freedom-
information-act-0) (last accessed May 15, 2024).

and there is no basis for the FBI to conclude that a search elsewhere would reasonably be expected to locate responsive records subject to the FOIA.

### PART III: JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA

22.    The FBI processed all records responsive to Plaintiff's request to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide Plaintiff with all material in the public domain and with all reasonably segregable, non-exempt information. The FBI did not withhold any reasonably segregable, nonexempt portions from Plaintiff.

23.    The FBI categorically denied the records pursuant to FOIA Exemptions (b)(5), (b)(6), and (b)(7)(C), with the exception of 115 pages of segregable information.[8]  The FBI also asserted Exemptions (b)(1), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E) as an additional basis to withhold records or portions of the categorically denied records. Further, as a result of the FBI's segregability review, the FBI withheld the name of an FBI Special Agent on 4 of the 115 pages of records it determined could be segregated from the categorically withheld records for disclosure.[9]

-------------------------

[8] The FBI numbered the releasable portion of its records as FBI(23-cv-2172)-1 through FBI(23-cv-2172)-115. On the pages released in full and in part, these numbers are typically located at the bottom of each page.

[9] During the FBI's efforts to provide Plaintiff with all material in the public domain and with all with all reasonably segregable, non-exempt information, it conducted a document-by-document, line-by-line review of the 115 pages of public source records, and ultimately released to Plaintiff 115 pages of responsive, non-exempt records. Within the released records the FBI protected exempt information on only four pages to protect the name of an FBI Special Agent pursuant to FOIA Exemptions 6 and 7(C).

JUSTIFICATION FOR CATEGORICALLY WITHHOLDING RECORDS IN FULL PURSUANT TO
EXEMPTIONS (B)(5), (B)(6), AND (B)(7)(C)

24.     With the exception of the 115 pages of segregable information noted above, the

FBI determined that the records within the background investigation meet the threshold

requirements for the presidential communications privilege, and/or would cause a clearly

unwarranted invasion of personal privacy, or could reasonably be expected to constitute an

unwarranted invasion of personal privacy. Therefore, these background investigation records

qualified for withholding under Exemptions 5, 6, and 7(C), as further described below.

### Background Investigation Records at Issue

25.     After the 2020 presidential election, then President-elect Joseph R. Biden, Jr.,

designated an official from the Office of the President-elect to request the initial full-field

background investigation of Alejandro Mayorkas, and on December 1, 2020, that official

initiated a Level I FBI background investigation.[10] The background investigation files contain

the following types of information: interviews of the appointee, their neighbors, references, and

employers/supervisors/coworkers; searches and results of government agency database records

checks; and medical and financial records detailing every aspect of the past health and financial

history of Alejandro Mayorkas.

26.     The types of information that could exist within background investigative files

include a wealth of personally identifying information, as well as intimate details about the

---

[10] The FBI acknowledges that Plaintiff's request includes previous background investigations on
Mr. Mayorkas for his nomination of Deputy Secretary of Homeland Security, Director of the
United States Citizenship and Immigration Service, and United States Attorney General for the
Central District of California. However, those previous background investigations were
incorporated into the FBI's response to the December 1, 2020, request, and are thus
encompassed within the most recent request.

subject of the investigation, their families, personal relationships, and associates. Records could also reveal past criminal acts or behaviors occurring after the age of eighteen that are no longer part of the public record. Releasing certain private records on these individuals could cause them, their families, their friends, and their associates (personal and professional) embarrassment, and potentially subject them to public scrutiny or harassment.

*Exemption (b)(5) – Privileged Information*

27.    Exemption 5 of the FOIA exempts from mandatory disclosure "inter-agency" or "intra-agency" memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

28.    Exemption 5 incorporates the traditional privileges that the government may assert in civil litigation against a private litigant, including the privileges that are constitutionally based, and exempts from FOIA's reach documents covered by such privileges.

*Presidential Communications Privilege*

29.    The presidential communications privilege applies to documents and other materials that reflect presidential decision-making and deliberations that the President believes should remain confidential. The privilege protects not only direct communications with the President, but also communications solicited and received by immediate presidential advisors and members of their staffs in the course of preparing advice for the President, even when those communications are not made directly to the President. This privilege preserves the President's ability to obtain frank information from his advisors and to make decisions in confidence. The scope of this privilege is defined in terms of communications that involve the Office of the President, the exercise of the President's responsibilities, and confidential presidential decision-making. One such Presidential responsibilities is the nomination Officers of the United States.

13

Under Article II Section 2 of the United States Constitution, it is the President's responsibility to "nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States . . ."

30.    After general elections, the executive administration of an outgoing administration is obligated by law to conduct certain activities to ensure an orderly transition to the new administration.[11] The presidential transition period begins on the day transition funds are authorized pursuant to Section 8(b) of the Presidential Transition Act of 1963, codified as amended at 3 U.S.C. § 102, and ending upon the inauguration of the new President. The term "President-elect" is defined as in Section 8(c) of the Act, *i.e.*, "the apparent successful candidate[] for the office of the President…as ascertained by the [General Services] Administrator following the general elections…" Pursuant to this Act, "any apparent successful candidate for the Office of President should submit to the Federal Bureau of Investigation…the names of candidates for high level national security positions through the level of undersecretary of cabinet departments as soon as possible after the date of the general elections…" 3 U.S.C. § 102 (3)(f)(1). Then, "the responsible agency or agencies shall undertake and complete as expeditiously as possible the background investigations necessary to provide appropriate security clearances to the individuals who are candidates described under paragraph (1) before the date of the inauguration of the apparent successful candidate for the office of President as President…" 3

---

[11] *See generally* Presidential Transition Act of 1963, 3 U.S.C. § 102.

U.S.C. § 102 (3)(f)(2).

31.     The General Services Administrator authorized transition funds for Joseph R.

Biden, JR. on November 23, 2020.[12] In order to assist the President-elect with this constitutional

decision-making role, and pursuant to the mandate given the FBI in the Presidential Transition

Act to complete background investigations for President-elects, the DOJ entered into a revised

Memorandum of Understanding (MOU) with President-elect Joseph R. Biden, JR on November

24, 2020 regarding FBI background investigations of candidates for high-level national security

positions in a new presidential administration. *See* **Exhibit G**, *Memorandum of Understanding*

*Between the Department of Justice and the Biden Presidential Transition Regarding Name*

*Checks and Background Investigations Conducted by the Federal Bureau of Investigation And*

*Adjudications by the Department of Justice ELECTION 2020* ("2020 MOU"). Pursuant to that

MOU, the FBI will conduct background investigations at the request of the Biden Presidential

Transition, or his designated representative, with the consent of the subject of the investigation.

*Application of the Presidential Communications Privilege to the Mayorkas Background*
*Investigations*

32.     The background files at issue in this case, were requested on behalf of, and

provided to, the Office of the President-elect to assist him in a fundamental constitutional matter

of Presidential decision-making—whether to nominate Mr. Mayorkas as Secretary of Homeland

Security, or some other high-level national security position, in his new administration. Although

---

[12] *See* https://www.gsa.gov/system/files/2020-11-23_Hon_Murphy_to_Hon_Biden_0.pdf (last
accessed July 23, 2024).

the background investigation was requested before Mr. Biden was sworn in as President, Mr.

Mayorkas was not confirmed by the Senate as Secretary of Homeland Security until February 2,

2021.[13] Therefore, President Biden continued to rely on the information contained in the

background files to continue to support Mr. Mayorkas's nomination once Mr. Biden had become

President. Additionally, the background files relate to a decision that only a President could

make – whether to nominate an individual for a cabinet position and whether that person was

qualified to hold a security clearance. The materials are therefore covered by the presidential

communications privilege. Disclosure of this material would inhibit the President's ability to

seek and obtain candid information. If future President-elects or candidates for high level

national security positions knew that the background investigation files could be made public

under the FOIA, that would have a chilling effect on a President-elect's ability to successfully

recruit highly qualified individuals for these positions and harm the President's decision making

process, which the presidential communications privilege is intended to protect. Accordingly, the

FBI concluded that these materials fall squarely within the protections afforded by the

presidential communications privilege and must be withheld in full. Because the FBI concluded

that the privilege applies to the materials in their entirety, no segregation is possible.

Accordingly, the background investigation files were withheld in full pursuant to Exemption

(b)(5) in conjunction with the presidential communications privilege.

33.     For this category, "potential presidential decision making" is defined only to

include those communications for which the principle purpose of the communications was to

prepare for potential Presidential decisions that could only be made after the Inauguration. All of

---

[13] Joseph R. Biden, JR was sworn in as President on January 20, 2021.

the withheld material was transmitted to the Biden Presidential Transition. Pursuant to Section

5(a) of the MOU, the background files were transmitted to and viewed by only people in the

Biden Presidential Transition "directly involved in…making a determination as to an

Appointee's suitability for employment/appointment/recognition or trustworthiness for access to

sensitive (e.g., law enforcement matters, personal information about individuals, privileged

commercial or financial information, etc.) or classified information." (Exhibit G at 4). Because

all of the withheld material was sent to the Office of the President-Elect to assist the President-

Elect in determining if Mr. Mayorkas should be nominated for a high level national security

position and the viewing of it was restricted to only people the President-Elect entrusted with

advising in such decisions, it was determined that all of the material falls under the presidential

communications privilege.  The materials were solicited by the President-Elect to assist in

presidential decision making, namely nominating cabinet officials. Disclosing transition

deliberations would jeopardize the ability of future President-elects to have full and candid

discussions with their advisers and would undermine the ability to protect the confidentiality of

discussions on the same matters after the President-elect takes office. Once the transition was

complete, President Biden continued to rely on the information in the background files. All of

the withheld material falls under the presidential communications privilege.

*Exemption 7 Threshold*

34.     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it

must first demonstrate that the records or information at issue were compiled for law

enforcement purposes. Pursuant to 28 USC §§ 533, 534, and Executive Order 12,333 as

implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM)

and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with

authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States.

35.    The responsive records in this case were compiled pursuant to the FBI's investigative authority. An effective Senate-confirmed nomination process relies on proper vetting of nominees to ensure that they are fit to serve. Background investigations are an integral part of such vetting of Senate-confirmed and other nominees, as well as federal employees and contractors. The purpose of the background investigation at issue was to determine if Mr. Mayorkas was suitable for a high-level national security position and to access sensitive law enforcement or classified information. Indeed, he ultimately was nominated and confirmed as the Secretary of the Department of Homeland Security, one of the highest national security positions in the country. Accordingly, background investigations conducted to assess a nominee's or applicant's qualifications inherently relate to law enforcement, and as such, records compiled during background investigations are compiled for law enforcement purposes. Here, the FBI is authorized to conduct such investigations pursuant to the 2020 MOU between the DOJ and Presidential Candidate Joseph R. Biden, JR.

*FOIA Exemptions (b)(6) and (b)(7)(C) - Unwarranted Invasion of Personal Privacy*

36.    Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). All information that applies to a particular person falls within the scope of Exemption 6.

37.    Exemption 7(C) similarly exempts from disclosure "records or information

18

compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[14]

38.    When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. For purposes of these exemptions, a public interest exists only when information about an individual, their name, or their identifying information[15] would shed light on the FBI's performance of its mission to protect the American people and uphold the Constitution of the United States, and its function to: protect the United States from terrorist attack; protect the United States against foreign intelligence, espionage, and nefarious cyber operations; combat significant criminal cyber activity, public corruption, transnational criminal enterprises, white-collar crime, and violent crime; and protect civil rights. In each instance wherein, information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that Mr. Mayorkas'

---

[14] The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under both exemptions.

[15] Hereafter, identifying information includes the following: dates of birth, places of birth, residences, telephone numbers, social security numbers, and/or singular professional titles.

privacy interests outweighed any public interest in disclosure.

<u>Categorical Denial Pursuant to Exemptions b(6) and (b)(7)(C)</u>

39.      In balancing privacy interests, the FBI identifies the substantial privacy interests

of the individuals within its records, in this case the background investigations of Mr. Mayorkas,

and weighs it against the public interest in disclosure. The FBI takes each factor – the

individual's substantial privacy interests, the requester's public interest argument, and evaluates

them on a case-by-case basis to determine if there exists a significant public benefit and whether

the benefit outweighs the substantial privacy interests of the individual. A person, who is the

subject of an investigation, especially a background investigation detailing the life events of a

significant portion of an individual's life retains substantial interests in preventing the disclosure

of his or her personal information regardless of the resulting individual's success in obtaining a

Presidential appointment, and approval to access or limited access to classified government

information. In most cases, an individual's investigative file would not shed light on the

government's operations and activities; therefore, disclosure would constitute a clearly

unwarranted invasion of personal privacy. Additionally, Mr. Mayorkas's status as a high-level

government official does not mean he has lost all privacy interests.

40.      To overcome the individual's substantial privacy interests, the requester must first

demonstrate the public interest qualifies for consideration and second, the public interest is

significant enough, on the balance, to outweigh the substantial privacy interests of the individual.

5 U.S.C. §§ 552 (b)(6), (b)(7)(C) (2016). To justify disclosure, the requester must clearly

demonstrate a significant public interest that is so compelling, it outweighs the substantial,

individual privacy interest. In the absence of this showing, the individual's substantial privacy

interests outweigh any public interest in disclosure. In this case, Plaintiff did not make a public

policy argument for why the privacy interest is outweighed. Instead, Plaintiff only made conclusory argument that the background investigation being shared with Congress meant that it must be released to the public.

41.    The FBI determined that even though it acknowledges that it has documents which are responsive to Plaintiff's request, they are all categorically exempt from disclosure pursuant to FOIA Exemptions 6 and 7(C). The FBI considered the public interest and balanced it against Mr. Mayorkas's privacy interest. Considering Mr. Mayorkas' substantial privacy interest in the personal information present in these records, including information about his private life which is often subject to scrutiny in background investigations, disclosure of this information would constitute a massive intrusion into his personal privacy. There needs to be an overwhelming public interest to justify such an intrusion. Without evidence of wrongdoing/impropriety by the FBI or other federal government agencies concerning the background investigation process, the private details of Mr. Mayorkas' life obtained during an authorized background investigation should remain private. After balancing these interests, the FBI determined Mr. Mayorkas' privacy interest outweighed the public interest in disclosure. As a result, all documents in FBI records related to the background investigations of Mr. Mayorkas that are responsive to Plaintiff's request are withheld in full because to publicly reveal any details from these documents would violate the privacy rights of, first and foremost, Mr. Mayorkas and secondarily, the privacy interests of the many other individuals who are mentioned in these documents, resulting in a clearly unwarranted and unwarranted invasion of

personal privacy.[16]

### Reasonable Expectation of Invasion of Personal Privacy

42.     The FBI contrasted Plaintiff's FOIA request to the FBI handling of other FOIA

requests on high-profile individuals in public positions, for whom requesters failed to provide

proof of death or privacy waivers. In all of these cases, the FBI determined these individuals had

somewhat diminished privacy interests because of their high rank and authority within their

respective agency or elected position – release of information about their conduct while in these

positions is much more likely to shed light on government activities considering the decision-

making power/influence these individuals possessed as high-ranking executives and/or public

official service. However, even within these FOIA requests, the FBI still protected these

individuals' personal information and only considered processing records that would shed light

on government operations or their improprieties while in public positions. In contrast, the subject

of Plaintiff's request (on whom the FBI actually possessed records) did not have any publicly

known criminal history, or publicly known ongoing criminal investigations at the time of his

background investigations. Also, at the time of the investigations, they were only potential

appointees, which in some cases needed further Senatorial confirmation, and had yet to assume

positions of high public trust/interest. The request would not shed light on any government

activities Mr. Mayorkas has taken since becoming Secretary of Homeland Security because the

records at issue predated him assuming that position.

---

[16] In addition to the FBI withholding the background investigation files in full pursuant to FOIA
Exemptions 6 and 7(C). The FBI also asserted FOIA Exemptions 6 and 7(C) to withhold certain
information within the pages released to Plaintiff as described in ¶¶ 75-77, *infra*.

43.     Plaintiff failed to provide sufficiently compelling evidence showing how disclosure of this type of information and/or records would benefit the public's understanding of government operations enough to outweigh Mr. Mayorkas' legitimate privacy interest. As such, the FBI has categorically withheld Mr. Mayorkas' background investigation files pursuant to FOIA Exemptions 6 and 7C.

*Categorical Review of the Background Investigation Files*

44.     The background investigation files implicated by Plaintiff's FOIA request are categorically exempt from disclosure pursuant to FOIA Exemptions 5, 6, and 7C. Pursuant to *Bevis v. Dep't of State*, 801 F.2d 1386, 1388 (D.C. Cir. 1986), the FBI is providing an analysis of the functional categories and the types of categorically withheld records.

45.     *Functional Categories*: For purposes of outlining the additional grounds for withholding certain portions of the categorically exempt records, the FBI categorized the types of exempt records into three categories – Evidentiary/Investigative Materials, Administrative Materials, and Public Source Materials. The first two categories are outlined in more detail within the chart below.  The third category, Public Source materials, is discussed in ¶¶ 47-48, *infra*. A record can fall into one or more functional categories as described below. For example, a record collected, such as a law enforcement records check, may serve dual purposes and may contain both administrative directions, and/or evidentiary materials. Therefore, the information in each record could be included in multiple categories.

| **Functional Category 1 (FC 1): Evidentiary/Investigative Materials** |
|---|
| This category includes copies of records or evidence, analyses of evidence, and derivative communications discussing or incorporating collected evidence. A derivative communication describes, verbatim or in summary, the contents of the original record, how it was obtained, and how it relates to the investigation. Other derivative communications report this information to other FBI field offices, other law enforcement agencies, or other Federal agencies, either to advise them about the progress of the investigation, or to elicit their assistance in handling investigative leads. The following subparagraphs describe the types of evidentiary materials |

that exist within the responsive records and the anticipated harms that could reasonably result from disclosure. Following this general description, the declaration outlines the specific exemptions asserted over portions of the categorically exempt records.

| TYPE | DESCRIPTION |
|---|---|
| Information Provided by Interview Subjects | Background investigation files typically contain information provided by interview subjects, such as the appointee, personal references, neighbors, and prior employment contacts. Interview statements often form the basis for defining the personal character and qualifications of the third-party subjects. Revealing this information would reveal the identities of the interview participants and/or the provided information. It would also reveal key information about FBI techniques and procedures for asking probing questions to obtain accurate information. |
| Information Concerning Physical or Documentary Evidence | Disclosure of information concerning physical or documentary evidence gathered during the investigation, or information discussing, describing, or analyzing the physical or documentary evidence, would undermine the identified third party's privacy interests as it would reveal non-public details about personal, medical, and financial history the FBI investigated. The information contains a myriad of personal data about the third parties gathered during routine investigative activities. This would reveal information well beyond what is publicly known about the FBI's investigation of these third parties. Such a release could lead to embarrassment, false inferences, degradation of the perception of third parties' personal character, revelation of personal details about his life he may not want publicly disclosed, and potentially additionally harassing inquiries directed at the third parties. Additionally, release of his personal identifying information (date of birth, social security number, place of birth, etc.) would expose the third-party individuals to potential identify theft, negatively affecting their lives for years into the future. Thus, release of this information could reasonably be expected to constitute an unwarranted invasion of his personal privacy. |

**Functional Category 2 (F.C. 2): Administrative Materials**

Materials falling within this category include items such as case captions, serial numbers, identities of FBI field offices, dates of investigations, and detailed instructions designed to ensure that investigative procedures are conducted within the appropriate FBI and DOJ guidelines. The following subparagraphs describe the types of administrative materials contained within background investigations and the anticipated Exemptions 6/7(C) harms that could reasonably result from disclosure.

| TYPE | DESCRIPTION |
|---|---|
| Reporting Communications | These communications permit an agency to monitor the progress of background investigations and to facilitate its conduct. These communications have the potential to reveal or confirm the cooperation of other local, state, and federal government agencies who assisted in these investigations. These communications are replete with detailed information about the FBI's investigative activities as well as detailed information about potential interview subjects. As such, they could reveal non-public details about the scope of the FBI's investigation of the third-party individuals, potentially reveal their personal identifying information, reveal the origins of pertinent FBI investigative information collected, and reveal their possible connections to undisclosed FBI investigative efforts. The release of this information, should it exist, would risk the harms described supra at ¶¶ 44-45, and could reasonably be expected to constitute an unwarranted invasion of his personal privacy. |
| Miscellaneous Administrative Documents | These materials could include items such as transmittal forms and standardized forms used for a variety of purposes. These types of materials are used throughout background investigations for many routine purposes. Releasing this category of documents would violate the third-party individual's personal privacy as it would reveal undisclosed details about the scope and direction of the FBI's investigation, potentially his personal identifying information, and risk the harms enumerated supra at ¶¶ 44-45. |
| Administrative Instructions | This type of information, whether it originates in communications from the FBI or other government or law enforcement agencies, could disclose specific investigative procedures employed in this investigation. Release of this information would undermine Mr. Mayorkas' privacy interests as it would reveal undisclosed details about the scope and direction of the FBI's investigation, potentially their personal identifying information, and risk the harms enumerated supra at ¶¶ 44-45. |

46.    _Document Types:_  To help explain to the Plaintiff and Court why the FBI

determined the background investigatory files were categorically exempt pursuant to FOIA

Exemptions 5, 6, and 7(C), below are descriptions of the types and categories of documents that

exist within the background investigation records responsive to Plaintiff's FOIA request. The

descriptions of the document types show that the information is very personal in nature, and

withholding the material categorically protects the privacy interests of Mr. Mayorkas at issue

here. Providing an actual accounting of the information located within the documents, including

the page count of the collected records, in light of the categorical exemption pursuant to FOIA

25

Exemptions 5, 6, and 7(C), would reveal privileged information, and/or constitute an unwarranted invasion of Mr. Mayorkas' personal privacy. While not providing a level of detail that would undermine Mr. Mayorkas' privacy interests, the chart below provides the Court and Plaintiff with a description of the specific types of exempted records located within these background investigation files and indicates the functional categories applicable to each.

| TYPE | DESCRIPTION | F.C. 1 INV | F.C.2 ADM |
|---|---|---|---|
| Electronic Mail Messages (emails) | These documents consist of emails between FBI personnel, between FBI personnel and private citizens/corporations, between FBI personnel and Other Government Agency (OGA) personnel, and/or between FBI personnel and state and local law enforcement agencies. | X | X |
| FD-302s[17] | FD-302s are internal FBI forms in which evidence is often documented, usually the results of FBI interviews. Such evidence and/or interview information may later be used as testimony or evidence in court proceedings/trials. Additionally, these evidence/interview forms are often incorporated in other FBI documents which disseminate intelligence/investigative information, and can be utilized to set leads in furtherance of the FBI's investigative efforts. | X | X |
| Electronic Communications (ECs)/FD-1057s | ECs replaced the traditional FBI correspondence (i.e., Memoranda and Letters) as the primary vehicle of correspondence within the FBI. The purpose of an EC is to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network. These forms are often utilized to record and disseminate intelligence/investigative information and for general investigation administrative purposes. | X | X |
| FD-340, 1A Envelopes and Enclosures | These envelopes and enclosures are used to organize and store documents that need to be stored separately from the FBI file to which they are attached, due to their size. They usually contain handwritten notes of interviews, | X | X |

---

[17] The designation "FD-" is attached to forms created and utilized internally by the FBI.

| | | | |
|---|---|---|---|
| | photographs, diagrams, notes, and other various evidentiary documents. | | |
| Miscellaneous Administrative Documents | The FBI uses various types of forms throughout a criminal investigation, including storage envelopes, bulky exhibit cover sheets, transmittal forms (i.e., facsimile cover sheets), letters, and routing slips. Other documents in this category include notes, memoranda, letters, and other attachments of an administrative matter which do not fall into an official government format. | | X |
| FBI Memoranda and Letters Correspondence | These are ordinarily communications to DOJ officials, from one person to another at FBIHQ, or from one person to another within an FBI field office. They serve to assist in the overall supervision of a case by summarizing pertinent details of an investigation. The letter correspondence is used to communicate with non-FBI entities, including but not limited to, commercial businesses, and/or private citizens. | X | X |
| Other Evidentiary Documents | This category consists of any evidentiary documents gathered during the course of FBI investigations. The information in these documents is often incorporated in other FBI documents which disseminate intelligence/investigative information, and can be utilized to set leads in furtherance of the FBI's investigative efforts. | X | |
| FBI Records Checks | These documents are printout of queries of internal FBI databases. These documents are often incorporated in other FBI documents which disseminate intelligence/investigative information, and can be utilized to set leads in furtherance of the FBI's investigative efforts. | X | |
| Memorandums | These are ordinarily communications to DOJ officials, from one person to another at FBIHQ, or from one person to another within an FBI field office. They serve to assist in the overall supervision of a case by summarizing pertinent details of an investigation. | X | X |
| FD-1036 – Sentinel Import Forms | These are administrative forms attached to documents that are imported into the FBI's case administrative system, Sentinel. | | X |
| FBI Investigative Reports | These are summaries of investigations as of the date of the report. The purpose of these documents is to advise FBIHQ and FBI field offices of the investigative information that has been obtained concerning a particular investigation. | X | X |
| FBI Computer Printouts | These are printouts from internal FBI computer systems that describe information concerning FBI investigations. | X | X |

| | | | |
|---|---|---|---|
| | The information included on the documents may include file numbers, names, and addresses of subjects, other third parties, key dates and places of interview meetings, names of Special Agents ("SAs") assigned to investigations, and other similar information. | | |
| FBI Investigative Inserts | Internal FBI forms used to record investigative actions such as an FBI records check of a database of law enforcement records. These inserts are often incorporated into FBI Investigative Reports. | X | X |
| Other Investigative Documents | The FBI uses various types of forms throughout a background investigation that do not fit into an official government format. Documents included in this category may include, but is not limited to, storage envelopes, bulky exhibit cover sheets, transmittal forms (e.g., facsimile cover sheets), letters, and routing slips. Additionally, this category consists of various types of documents reflecting information and evidence gathered during an FBI investigation, the interview subjects from where such information and evidence was gathered, methods used to obtain the information and evidence, and methods used to analyze the information and evidence. To describe these investigative documents in this category any more specifically would reveal the scope of the FBI's investigation, as well as the collection methods used by the FBI. | X | X |
| Standard Form (SF) 86 | This is an electronic questionnaire used for investigation processing. The potential federal government employee applicant or appointee fills out the form detailing their personal, and professional lives since their eighteenth (18) birthday. The form includes authorization to obtain records and release of information. | X | X |
| Documents Implementing Sensitive Investigative Techniques | These various documents are utilized to implement specific, sensitive, investigative techniques. Describing these documents further would reveal these techniques or sensitive data concerning these techniques. | X | X |
| Collected Documentation | This category includes copies of records including; birth certificate, high school, and college transcripts, medical records, financial records, letters of reference. | X | X |
| FD-204 | This form is used to provide details, general background information, and investigative information concerning FBI investigations. | X | X |

*Category 3: Public Source/Non-Investigative Harm Materials*

47.     During the course of an FBI investigation, including this one, relevant and

pertinent articles in newspapers, magazines or other periodicals are placed by FBI employees into the investigative file. These materials contain information obtained from public sources such as newspapers, online material, court transcripts, criminal affidavits, and other court filings. FBI employees place these public source materials into the file for background and review purposes.

48.    In this case, the public source material released to Plaintiff consists of articles about/written by Mr. Mayorkas. The FBI had determined that the release of these specific public source documents would not reveal privileged information or violate Mr. Mayorkas's personal privacy, and as a result, the material was not categorically withheld. Accordingly, the FBI released 111 pages in full, and 4 pages in part, to Plaintiff consisting of public source material not posing any privileged or privacy harms from within the investigative files, as the information is already known to the public. The FBI determined that on four released in part pages, the name of an FBI Special Agent was exempt from disclosure pursuant to Exemptions (b)(6) and (b)(7)(C).  The FBI's justification for withholding this information is more fully explained in ¶¶ 75-77, *infra*.

ASSERTION OF UNDERLYING FOIA EXEMPTIONS

49.    As previously explained, the FBI determined it has segregated all non-exempt information from the background investigation files implicated by Plaintiff's FOIA request, and all other collected data in these background files is categorically exempt from disclosure pursuant to FOIA Exemptions (b)(5), (b)(6), and (b)(7)(C). The D.C. Circuit's ruling in *Maydak v. Dep't of Justice,* 218 F.3d 760 (D.C. Cir. 2000) provides guidance that as a general rule the government "must assert all exemptions at the same time, in the original district court proceedings," Accordingly, in light of the D.C. Circuit's ruling in *Maydak*, the FBI is also asserting FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E) as

additional grounds for withholding the categorically exempt records. The FBI's justification for

assertion of these underlying exemptions is more fully described below. Further description of

the information withheld, beyond what is provided in this declaration, could identify the actual

exempt information.

*Exemption 1 – Classified Information*

50.    The FBI's analysis for withholding classified information contained in the records

at issue is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552(b)(1).

Exemption 1 protects from disclosure those records that are:

    a.  specifically authorized under criteria established by an Executive Order to be kept
        secret in the interest of national defense or foreign policy; and

    b.  are in fact properly classified pursuant to such Executive Order.

51.    Before I consider an Exemption (b)(1) claim for withholding agency records, I

determine whether the information in those records satisfies the requirements of Executive Order

("E.O.") 13526, the executive order governing the classification and protection of information

that affects the national security, and whether the information complies with the various

substantive and procedural criteria of that order. Executive Order 13526, signed by President

Barack Obama on December 29, 2009, is the order that currently applies to the protection of

national security information. I am bound by the requirements of E.O. 13526 when making

classification determinations.

52.    For information to be properly classified, and thus properly withheld from

disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in

E.O. 13526 § 1.1 (a):

    1.  an original classification authority is classifying the information;

2. the information is owned by, produced by or for, or is under the control of the United States Government;

3. the information falls within one or more of the categories of information listed in § 1.4 of [the] order; and

4. the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

53.    As I will explain in further detail below, in my role as an original classification authority, I have determined that the information withheld pursuant to Exemption (b)(1) is under the control of the United States Government, is classified, and requires a classification marking at the "Secret," level since the unauthorized disclosure of this information reasonably could be expected to cause serious damage to national security. *See* E.O. 13526 § 1.2(a)(2). In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526 must be followed before information can be considered properly classified, such as, proper identification and marking of documents. In particular, I made certain that all procedural requirements of E.O. 13526 were followed:

1. each document was marked as required and stamped with the proper classification designation;

2. each document was marked to indicate clearly which portions are classified, which portions are exempt from declassification as set forth in E.O 13526 § 1.5(b);

3. the prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were adhered to;

4. the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed; and

5. any reasonably segregable portions of the classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

*Findings of the Declarant Regarding Exemption 1*

54.     With the above requirements in mind, I personally and independently examined the FBI information withheld pursuant to Exemption (b)(1). I determined all of the substantive, procedural, and administrative requirements set forth above have been satisfied. As a result, I concluded that the information protected pursuant to Exemption (b)(1) was properly classified, continues to warrant classification at the "Secret" level, and is exempt from disclosure pursuant to E.O. 13526 § 1.4(c) - "intelligence activities (including covert action), intelligence sources or methods, or cryptology."

*Information Currently Classified Pursuant to Executive order 13526 § 1.4(c) – Intelligence Activities, Sources and Methods*

55.     E.O. 13526 § 1.4(c), exempts intelligence activities (including covert action), intelligence sources and methods, and cryptology from disclosure. An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest. An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method -- and information generated by it -- is needed by U. S. intelligence/counterintelligence agencies to carry out their respective missions. Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity, and usefulness are to be preserved.

56.     In the records at issue, the FBI withheld information pursuant to Exemption 1 to protect intelligence activities and methods utilized by the FBI to gather intelligence. This information is classified because its release would reveal actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or

operations, and/or disclose the intelligence gathering capabilities of the activities and methods directed at specific targets. This information is classified because its release would disclose the intelligence gathering capabilities of the activities or methods directed at specific targets. The information concerning the intelligence activities and methods within the records at issue is very specific in nature, provided during a specific time period, and known to very few individuals.

57.    It is my determination that disclosure of specific information describing the intelligence activities and methods within the records at issue, which are still used by the FBI to gather intelligence information in other investigations, could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence gathering activities and methods used by the FBI; and (2) disclosure would reveal current targets of specific FBI national security investigations. With the aid of this detailed information, hostile entities could develop countermeasures which would, in turn, severely disrupt the FBI's intelligence gathering capabilities. This severe disruption would also result in severe damage to the FBI's efforts to detect and apprehend those who violate national security and criminal laws of the United States.

58.    The FBI protected the following categories of information specific to intelligence activities and methods because disclosure reasonably could be expected to cause serious damage to the national security of the United States.

59.    <u>File Number</u>: The FBI withheld a classified file number assigned to specific intelligence activities, including channelization and dissemination instructions. Their release would lead to exposure of particular intelligence activities and methods. As described above in paragraph ¶ 14, *supra*, individual file numbers are assigned by FBIHQ and field offices and contain a geographical prefix of the originating office and case number, which includes the

numerical characterization of the type of investigation, followed by a chronological number assigned to a specific investigation or activity.

60.    The disclosure of an intelligence file number in the aggregate will enable adversaries to attribute any information released from the records, the file number to that particular file. Through analysis of this information, in concert with other information, including publicly available information, adversaries could then identify the specific intelligence activity. Hence, a partial mosaic of the activity begins to appear as more information is identified as being associated with the particular file number, leading to the exposure of current activities. In other words, disclosure of the file number would allow the adversaries of the United States, or anyone not privileged to this information, to patch bits and pieces of information together until the activity is determined. The identification of the intelligence activity, which continues to be a source of intelligence to this day, will severely limit its use. In addition, disclosure will inform adversaries of the possible range of the FBI's intelligence capabilities, as well as the intelligence the FBI has gathered, or can collect, concerning them. This knowledge would provide violators of the national security laws of the United States with a means of avoiding of lawful regulations by potentially implementing countermeasures, making future operations more difficult and compromising intelligence operations. Accordingly, release of this file number can lead to the exposure of an intelligence activity utilized in FBI, and can reasonably be expected to cause serious damage to national security. This file number is properly classified at the "Secret" level pursuant to E.O. 13526 § 1.4(c) and are exempt from disclosure pursuant to FOIA Exemption 1.

61.    Acronym: The FBI withheld classified acronym that identify specific intelligence methods utilized by the FBI in its intelligence activities. The disclosure of this information could reasonably be expected to cause serious damage to the national security as it could permit hostile

analysts to ascertain the specific nature of the FBI's investigations. This information is properly classified at the "Secret" level pursuant to E.O. 13526 § 1.4(c) and is exempt from disclosure pursuant to FOIA Exemption 1.

*Exemption 3 – Information Protected by Statute*

62.     FOIA Exemption 3 exempts from disclosure information "specifically exempted from disclosure by statute . . . if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; <u>or</u> (A)(ii) establishes particular criteria from withholding <u>or</u> refers to particular types of matters to be withheld." 5 U.S.C. § 552 (b)(3). The OPEN FOIA Act of 2009 established an additional requirement that any statute "enacted after the date of enactment of the OPEN FOIA Act of 2009, [must] specifically cite[] to this paragraph" in order to qualify under Exemption 3.

*<u>National Security Act of 1947, 50 U.S.C. § 3024(i)(1)</u>*

63.     The FBI asserted Exemption 3 to withhold information pursuant to Section 102A(i)(1) of the National Security Act of 1947 (NSA), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA). This statute provides that the Director of National Intelligence (DNI) "shall protect, and shall establish and enforce policies to protect, intelligence sources and methods from unauthorized disclosure."[18] As relevant to 5 U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009. On its face, this federal statute leaves no discretion to agencies about

---

[18] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1). As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

withholding from the public information about intelligence sources and methods. Thus, the

protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute.

*See CIA v. Sims*, 471 U.S. 159 (1985).

64.     To fulfill its obligation of protecting intelligence sources and methods, the DNI is

authorized to establish and implement guidelines for the Intelligence Community (IC) for the

classification of information under applicable laws, Executive Orders, and other Presidential

Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). In

implementing this authority, the DNI promulgated Intelligence Community Directive 700, which

provides that IC elements shall protect "national intelligence and intelligence sources and

methods and activities from unauthorized disclosure."[19] The FBI is one of 18-member agencies

comprising the IC, and as such must protect intelligence sources and methods. 50 U.S.C. §

3003(4).

65.     Given the plain Congressional mandate to protect the IC's sources and methods of

gathering intelligence, the FBI has determined that intelligence sources and methods would be

revealed if any of the withheld information is disclosed to Plaintiffs. Therefore, the FBI is

prohibited from disclosing such information under 50 U.S.C. § 3024 (i)(1).[20]

66.     The FBI is asserting Exemption 3 in this case, at times in conjunction with

Exemptions 1 and 7(E) to protect information that would reveal intelligence sources and

---

[19] Intelligence Community Directive (ICD) 700, dated June 7 2012, at ¶ E.2.a.

[20] Although 50 U.S.C. § 3024 (i)(1) does not impose a requirement to articulate harm, disclosure
of this information presents a bona fide opportunity for individuals to develop and implement
countermeasures, resulting in the loss of significant intelligence information, sources, and
methods relied upon by national policymakers and the IC to safeguard national security.

methods. In some instances, information would reveal classified intelligence sources and methods protected by Exemption 1. In some instances, information was protected under Exemption 7(E) because unclassified intelligence sources and methods were employed as law enforcement techniques, procedures, or guidelines, and thus would qualify as both an intelligence source and method under Exemption 3 and a law enforcement technique under Exemption 7(E). Notably, § 3024 (i)(1) protects sources and methods regardless of whether they are classified. *See Sims*, 471 U.S. at 176.

<em>Exemption 5 – Privileged Information</em>

67.     As described in ¶¶ 27-28, *supra*, Exemption 5 has been construed to exempt documents or information normally privileged in the civil discovery context, and incorporates the deliberative process privilege. The deliberative process privilege protects predecisional, deliberative communications that are part of a process by which agency decisions are made. It protects opinions, advice, evaluations, deliberations, proposals, or recommendations that form part of an agency decision-making process, as well as the selection and sorting of factual information relied upon as part of the decision-making process.

68.     In order to apply Exemption 5, agencies must first satisfy the threshold requirement – *i.e.*, show that the information protected was "inter-agency or intra-agency." Once the threshold is satisfied, agencies must satisfy the elements of the pertinent privilege. With respect to the deliberative process privilege, agencies must show that the withheld information was both predecisional – *i.e.*, antecedent to a final agency decision – and deliberative – *i.e.*, part of the process in which the agency engaged in an effort to reach a final decision (whether or not any final decision was ever reached).

37

*Deliberative Process Privilege*

69.    Pursuant to Exemption (b)(5), the FBI withheld privileged, deliberative materials. The deliberative process privilege protects the internal deliberations of the government by insulating recommendations, analyses, opinions, and other non-factual information comprising the decision-making process. In turn, Exemption 5 allows for the withholding of such privileged material – *i.e.*, material that contains, or was prepared in connection with the formulation of, opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations. The privilege also protects records and information that if disclosed, would reveal the agency's collection of multitudinous facts, and the sorting, evaluation, and analysis of those facts in order to make recommendations or reach a final agency decision. Exemption 5, when asserted in conjunction with the deliberative process privilege, is predicated on the recognition that release of this privileged information would inhibit the government's development of policy and stifle its decision-making process. Furthermore, exempting such documents from disclosure also protects against public confusion that might result from preliminary disclosure of opinions and information that do not, in fact, reflect the final views or policies of the FBI. The exemption and privilege together protect not only documents but also the integrity of the deliberative process itself where exposure of the process would result in harm. The FBI invokes Exemption 5 and the deliberative process privilege because FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew that their opinions of the moment might be made a matter of public record at some future date, and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully explored options developed from robust debate.

70.     The FBI relied on Exemption 5 and the deliberative process privilege to withhold handwritten investigative interview notes. These materials reflect deliberations integral to reaching final agency decisions, or were key to a decision-making process aimed at developing policy/best agency decisions. The handwritten investigative interview notes are deliberative and pre-decisional. Additionally, in compliance with the FOIA Improvement Act of 2016, all of this material was created less than 25 years before the submission of Plaintiff's request.

71.     <u>Handwritten Investigative Interview Notes:</u> The FBI asserted Exemption 5 pursuant to the deliberative process privilege, to withhold handwritten investigative interview notes, which are inherently part of the deliberative process. They contain the Special Agents' shorthand notes containing thoughts, ideas, impressions and interpretations of the verbal interview of a third-party individual, as well as the information conveyed during the interview the Special Agents determined should be noted for purposes of further analysis and consideration. These thoughts, ideas, impressions, interpretations, and information are then fleshed out and distilled during the editorial process for the creation of the official FD-302 interview report, which reflects the FBI's final decision regarding the relevance of the impressions and information gleaned during the interview. The handwritten notes taken by the Special Agents during an interview may not reflect the entire scope of information covered during the interview as additional information may be added to the official FD-302 during the editing phase. Likewise, there could also be information contained within the handwritten interview notes that is not included in the official FD-302. Information not appearing in the official FD-302 may be imperative to note at the time of the interview for purposes of later analysis and consideration but may not necessarily be placed in the official record (*i.e.,* final FD-302) if the Special Agent ultimately concludes during the FD-302 editorial process that the

information is not pertinent to the investigation.

72.    Agents rely heavily on an individual's assistance through interviews, whether the person is an upstanding citizen or a criminal, and must have the freedom to take notes freely and quickly without the fear of release to the general public causing an opportunity to distort and/or misconstrue the words the special agents have penned. Accordingly, release of the handwritten interview notes would result in the following foreseeable harm: First, it would have a chilling effect on special agents' willingness to document their thoughts, impressions, interpretations, and in some instances, investigative strategies, which is imperative to their ability to prepare the official FD-302 interview report memorializing the interview. Such a result would lead to FD-302 reports that are less comprehensive and thus less helpful to the FBI's investigative process. Second, release of the handwritten interview notes would reveal special agents' internal deliberations and sorting of a multitude of ideas and, at times, investigative strategies considered at the time of the interview, but later determined not relevant or ineffective. Finally, release of the handwritten interview notes would also create public confusion as it will reveal information noted in the handwritten interview notes that special agents later determined was not necessary for inclusion in the final, official FD-302 interview report. Additionally, the handwritten interview notes, because they are not finalized, are considered a draft document, and until finalized in the official record FD-302, can change as the document is being edited. The handwritten interview notes predate the final agency decisions and reflect the give and take of deliberations, through the editing process, which leads to final, refined products.

73.    For the reasons discussed above, the FBI withheld handwritten investigative interview notes under Exemption (b)(5), in conjunction with the deliberative process privilege, as this material was found to be inextricably intertwined with agency deliberations.

*FOIA Exemptions (b)(6) and (b)(7)(C) Clearly Unwarranted Invasion of Personal Privacy and
Unwarranted Invasion of Personal Privacy*

74.     As described in ¶¶ 36-38 *supra*, Exemptions 6 and 7(C) have been construed to

exempt information that would constitute a clearly unwarranted and an unwarranted invasion of

personal privacy.

*Names and Other Identifying Information of FBI Special Agents and Professional Staff*

75.     Pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI withheld the names and

other identifying information of FBI Special Agents ("SAs") and professional staff. These FBI

SAs and professional staff were responsible for conducting, supervising, and/or maintaining the

investigations, and administrative activities related to the background investigations of Mr.

Mayorkas, reflected in the documents responsive to Plaintiff's request. These responsibilities

included, but are not limited to, the following: coordinating/completing tasks in support of the

FBI's investigative and administrative functions, compiling information, conducting interviews,

and/or reporting on the status of the investigations.

76.     Assignments of SAs to any particular investigation are not by choice. Publicity,

adverse or otherwise, arising from a particular investigation, may seriously prejudice their

effectiveness in conducting other investigations or performing their day-to-day work. The

privacy consideration is also applied to protect FBI SAs, as individuals, from unnecessary,

unofficial questioning as to the conduct of this or other investigations/investigative activities,

whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into

various criminal and national security violation cases. The publicity associated with the release

of an SA's identity in connection with a particular investigation could trigger hostility toward a

particular SA. During the course of an investigation, a SA may engage with all strata of society,

conducting searches and making arrests, both of which result in reasonable but nonetheless

41

serious disturbances to people and their lives. Persons targeted by such investigations, and/or those sympathetic to those targeted, could seek to inflict violence on a SA based on their participation in an investigation. This is because an individual targeted by such law enforcement actions may carry a grudge against those involved with the investigation, which may last for years. These individuals may seek revenge on SAs and other federal employees involved in a particular investigation. There is no public interest served by disclosing the SAs' identities because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. Thus, disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy; and the FBI properly withheld the names and identifying information of FBI SAs pursuant to Exemptions 6 and 7(C).

77.    The FBI also withheld the names and identifying information of FBI professional staff pursuant to Exemptions 6 and 7(C). These FBI professional staff were assigned to handle tasks related to the background investigations of Mr. Mayorkas. Similar to FBI SAs, these FBI employees could be targeted for reprisal based on their involvement in specific investigations. Furthermore, these FBI professional staff were, and possibly are, in positions of access to information regarding official law enforcement investigations, and therefore could become targets of harassing inquiries for unauthorized access to investigations if their identities were released. Thus, these individuals maintain substantial privacy interests in not having their identities disclosed. In contrast, the FBI concluded that no public interest would be served by disclosing the identities of these FBI professional staff to the general public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. Accordingly, after balancing these professional staff employees' substantial privacy interests against the non-existent public interest, the FBI determined

disclosure of their identities would constitute a clearly unwarranted invasion of their personal

privacy. Therefore, the FBI properly withheld the names and identifying information of FBI

professional staff pursuant to Exemptions 6 and 7(C).[21]

### (b)(6) and (b)(7)(C): Names and Other Identifying Information of Third Parties who Provided Information

78.     Pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI withheld the names and

other identifying information of third parties who provided information, to the FBI during its

background investigations of Mr. Mayorkas. The identifying information of, and information

provided by, these third-party individuals appears within the FBI's files because these

individuals willingly divulged information relevant to FBI investigative efforts. These

individuals were not of investigative interest to the FBI. Plaintiff has not provided a privacy

waiver from the third-parties authorizing release of their information, nor has Plaintiff supplied

proof of death; therefore, these individuals maintain substantial and legitimate privacy interests

in not having their cooperation or connection to FBI law enforcement matters disclosed.

Considering the FBI is an investigative and intelligence agency, disclosure of these individuals'

names or identifying information in connection with FBI records carries an extremely negative

connotation.

79.     Disclosure of the identities of individuals who willingly provide information to

the FBI could subject these individuals to harassment or embarrassment, undue public attention,

and/or unwanted inquiries for information related to their assistance. They could also be targeted

---

[21] The FBI also withheld this information pursuant to Exemptions 6 and 7(C) on 4 pages of
public source material released to Plaintiff at Bates-numbered pages, FBI(23-cv-2172)-1 through
FBI(23-cv-2172)-4.

for retaliation by investigative subjects or by those who simply disparage cooperation with law enforcement. Exposure of a third party's cooperation with law enforcement could also lead to legal or economic detriment, negative professional and social repercussions, possible physical harm, or even death. Thus, the FBI has determined these individuals maintain substantial privacy interests in not having their identities disclosed.

80.    In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure of these individual's names and identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI. The FBI concluded there was no public interest sufficient to override theses individuals' substantial privacy interests; therefore, the FBI properly withheld these individuals' privacy interests pursuant to Exemptions 6 and 7(C).

### (b)(6) and (b)(7)(C: Names and Other Identifying Information of Third Parties Merely Mentioned

81.    Pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI withheld the names and other identifying information of third parties who were merely mentioned in the investigative records responsive to Plaintiff's request. The FBI has information about these third parties in its files because these individuals were tangentially mentioned in conjunction with FBI investigative efforts. These individuals were not of investigative interest to the FBI. These third parties maintain substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with FBI law enforcement matters. Considering the FBI is an investigative and intelligence agency, disclosure of these third parties' names and/or identifying information in connection with an FBI investigation carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus

derogatory inferences and suspicion on them. The FBI then considered whether there was any public interest that would override these privacy interests, and concluded that disclosing information about individuals who were merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly withheld these individuals' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

### *(b)(6) and (b)(7)(C): Identifying Information of a Person Undergoing a Background Investigation*

82.     Pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI withheld identifying information of the candidate for federal employment, Alejandro Mayorkas, who was undergoing a background investigation to determine eligibility for federal government. Releasing the personal identifying information of Mr. Mayorkas to the public would be considered an unwarranted invasion of the individual's privacy rights, as well as provide important identifiers for individuals involved in personal identity theft. In addition, these personal identifiers can be used to unlock the personal email and financial accounts of the individuals, because they are often answers to questions posed to validate the identity of the user. Accordingly, the FBI determined Mr. Mayorkas maintains substantial privacy interests in not having personal details from his background investigations disclosed. In contrast, disclosing personal information about Mr. Mayorkas background investigations would not significantly increase the public's understanding of the FBI's performance of its mission and so the FBI concluded that the public interest here was insufficient to override Mr. Mayorkas' substantial privacy interests. For these reasons, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### *(b)(6) and (b)(7)(C): Names and Other Identifying Information of Non-FBI Federal Government Personnel*

83.     Pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI withheld the names and identifying information of personnel from non-FBI federal government agencies who provided information to or otherwise assisted the FBI in its background investigation of Mr. Mayorkas. The rationale for protecting the identities of other government employees is the same as the rationale for protecting the identities of FBI employees. *See* ¶¶ 75-77, *supra*. Publicity, adverse or otherwise, concerning the assistance of these other agency employees in an FBI investigation would seriously impair their effectiveness in assisting or participating in future FBI investigations. The privacy consideration also protects these individuals from unnecessary, unofficial questioning as to the FBI investigation. It is possible for a person targeted by law enforcement action to carry a grudge which may last for years, and to seek revenge on the personnel involved in the investigations at issue in these FBI records. The publicity associated with the release of their names and/or identifying information in connection with these investigations could trigger hostility towards them by such persons. Therefore, these employees maintain substantial privacy interests in not having their identities disclosed in this context. In contrast, there is no public interest to be served by the disclosure of these employees' names and/or identifying information because their identities, by themselves, would not demonstrate how the FBI performed its statutory mission and thus, would not significantly increase the public's understanding of the FBI's operations and activities. Accordingly, the FBI properly protected these employees' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

### *(b)(6) and (b)(7)(C): Names and Other Identifying Information of Local Law Enforcement Personnel*

84.     Pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI withheld the names and

identifying information of local law enforcement employees. These employees were acting in their official capacities and aided the FBI in the law enforcement investigative activities reflected in the records responsive to plaintiff's requests. The rationale for protecting the identities of FBI SAs and professional staff discussed in ¶¶ 75-77, *supra* applies equally to the names and identifying information of these local law enforcement employees. Release of the identities of these law enforcement employees could subject them as individuals to unnecessary and unwelcome harassment that would invade their privacy, and could cause them to be targeted for reprisal. In contrast, disclosure of this information would serve no public interest because it would not shed light on the operations and activities of the FBI. Accordingly, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### *(b)(6) and (b)(7)(C): Names and Other Identifying Information of Local Government Personnel (Non-LE & State)*

85.    Pursuant to Exemptions (b)(6) and (b)(7)(C) the FBI withheld the names and other identifying information of local government personnel pursuant. The rationale for protecting the identities of local law enforcement personnel discussed in ¶ 84, *supra*, applies equally to the names and identifying information of these local government employees. Release of the identities of these local government employees could subject them as individuals to unnecessary and unwelcome harassment that would invade their privacy and could cause them to be targeted for reprisal. In contrast, the FBI concluded that no public interest would be served by disclosing the identities of these local government employees to the general public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. Accordingly, after balancing these local government employees' substantial privacy interests against the non-existent public interest, the FBI determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal

47

privacy. Therefore, the FBI properly withheld the names and identifying information of local

government personnel pursuant to Exemptions 6 and 7(C).

*Exemption 7(D) – Confidential Source Information*

86.    Exemption 7(D) exempts "records or information compiled for law enforcement

purposes" when disclosure:

> could reasonably be expected to disclose the identity of a confidential source,
> including a State, local or foreign agency or authority or any private institution
> which furnished information on a confidential basis, and, in the case of a record or
> information compiled by a criminal law enforcement authority in the course of a
> criminal investigation, or by an agency conducting a lawful national security
> intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).

87.    Numerous confidential sources report to the FBI on a regular basis; they provide

information under express assurances of confidentiality and are "informants" within the common

meaning of the term. Others are interviewed and/or provide information under implied

assurances of confidentiality (*i.e.*, under circumstances from which assurances of confidentiality

may be inferred). In either situation, these sources are considered to be confidential because they

furnish information only with the understanding that their identities and the information they

provided will not be divulged outside the FBI. Information provided by these sources is singular

in nature, and if released, could reveal their identities. The FBI has learned through experience

that sources assisting, cooperating with, and providing information to the FBI must be free to do

so without fear of reprisal. The FBI has also learned that sources must be free to furnish

information to the FBI with complete candor and without the understandable tendency to hedge

or withhold information because of fear that their cooperation with the FBI will later be made

public. Whether the content is unfavorable or not, sources who provide information to the FBI on

a confidential basis should be assured that both their assistance and their identities will be protected.

88.     The release of a source's identity would forever eliminate that source as a future means of obtaining information. In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources. Such a result undermines one of the FBI's most important means of collecting information and could thereby severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal laws.

*(b)(7)(D): Names and Other Identifying Information of Individuals who Provided Information Under an Express Assurance of Confidentiality and Information Provided*

89.     Pursuant to Exemption (b)(7)(D), the FBI withheld the name and other identifying information of an individual who provided information under an express assurance of confidentiality and the information they provided. When processing the records at issue, the FBI found evidence this individual, who provided specific and detailed information that is singular in nature, requested their identity not be revealed.

90.     Providing express assurances of confidentiality is essential to the FBI's ability to obtain relevant and accurate information from confidential sources. Without these assurances by the FBI, those with access to information critical to FBI investigations may be reluctant to provide information or may modify their statements in order to lessen the severity of any backlashes; therefore, the FBI must provide credible assurances of confidentiality to these individuals in order to obtain factual, relevant, and timely information. Release of these sources' identities and/or any singular information they provided may lead to the revelation of their identities and would also display unwillingness by the FBI to honor its assurances of

confidentiality to current and future confidential sources. Therefore, releasing this information would have a lasting negative impact on the FBI's information program – it would greatly hinder the FBI's ability to recruit and maintain confidential sources willing to provide accurate and relevant information pertaining to criminal activities.

91.     In sum, the FBI located evidence that a certain individual supplied information to the FBI with express assurance their name and other identifying information, and the information they provided would be held in confidence. Release of such information would endanger this confidential source and cause great detriment to the FBI's ability to recruit and maintain reliable confidential sources; thus, the FBI withheld this information pursuant to Exemption 7(D). The FBI is asserting Exemptions 6 and 7(C)  in this case, at times in conjunction with Exemption 7(D) to protect this information.

### Exemption (b)(7)(E) Investigative Techniques and Procedures

92.     FOIA Exemption (b)(7)(E) provides protection for:

> law enforcement records [which]…would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).

93.     The FBI asserted Exemption (b)(7)(E) to withhold information from these records, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

94.     Within the responsive documents, the FBI applied Exemption (b)(7)(E) to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement

50

mission, to non-public details about techniques and procedures that are otherwise not known to the public, and also to guidelines for law enforcement investigations or prosecutions. Specifically, the FBI asserted Exemption 7(E) to protect the following categories of information.

### *(b)(7)(E): Sensitive Investigative File Numbers*

95. Pursuant to Exemption (b)(7)(E), the FBI withheld sensitive investigative file numbers. The FBI determined this exemption is appropriate for protecting these file numbers as the release of file numbering convention identifies the investigative interest or priority given to such matters. The file numbers the FBI protected are not known to the general public. These file numbers contain three separate portions. The first portions of these file numbers consist of FBI file classification numbers which indicate the types of investigative/intelligence gathering programs to which these files pertain. Many of the FBI's classification numbers are public, which makes disclosure of this information even more telling. Release of known file classification numbers in the context of investigative records would immediately reveal the types of investigations being pursued, and thus the types of investigative techniques and procedures available to FBI investigators, and/or non-public facets of the FBI's investigative strategies. For example, revealing the FBI has a money laundering investigative file on a subject who was only known to be investigated for crimes related to public corruption, would reveal key non-public information about the FBI's investigative strategies and gathered evidence. Additionally, releasing non-public FBI file classification numbers would reveal critical information about non-public investigative techniques and procedures, and provide criminals and foreign adversaries the ability to discern the types of highly sensitive investigative strategies the FBI is pursuing whenever such file classification numbers are present within these and other sensitive FBI investigative records.

96.     The protected investigative file numbers also contain two letter office of origin codes, indicating which FBI field office or overseas FBI legal attaché originated the investigations at issue. Providing this information, in many instances, would provide critical information about where and how the FBI detected particular criminal behaviors or national security threats, and reveal key pieces about the FBI's non-public FBI investigations or intelligence/evidence gathering sources and methods. Revealing this information could also risk disclosing unknown FBI investigations or intelligence gathering initiatives, by revealing interests in varying areas of FBI investigative responsibility. Releasing this information could also possibly provide significant information about the FBI's failure to detect certain types of criminal behavior. For example, a criminal operating out of San Francisco, California with ties to a criminal organization under investigation in the FBI's Seattle Field Office, could request the FBI's Seattle Field Office's investigative file. If the FBI were to reveal all of the originating office codes in the investigative files present in Seattle's file, and there was no indication the FBI ever pursued an investigation in San Francisco, the criminal could reasonably assume the FBI failed to locate any evidence of their wrongdoing, emboldening them to continue their activities, undeterred.

97.     The third portion of these investigative files consists of the numbers given to the unique investigative initiatives these files were created to memorialize. Releasing these singular file numbers would provide criminals and foreign adversaries with a tracking mechanism by which they can place particular files/investigations within the context of larger FBI investigative efforts. Continued release of sensitive investigative file numbers would provide criminal with an idea of how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies. This would provide criminals with a means of judging where

the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge-gaps in the FBI's gathered intelligence.

98.     In summary, repeatedly releasing sensitive FBI investigative file numbers would allow determined criminals and foreign adversaries to obtain an exceptional understanding of the body of investigative intelligence available to the FBI; and where, who, what and how it is investigating certain detected activities. Release of this information would enable these criminals and foreign adversaries to predict FBI investigations and structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law. Accordingly, the FBI properly asserted FOIA Exemption 7(E), in conjunction with Exemption 3, to withhold this type of information.

### (b)(7)(E): Internal FBI Secure Fax Numbers, Non-Public Intranet Web Addresses, and Telephone Numbers

99.     Pursuant to Exemption (b)(7)(E), the FBI withheld secure fax numbers, non-public intranet web addresses and telephone numbers. More specifically, this type of information could provide criminals with specific targets for possible cyber-attacks and other types of attacks on FBI secure communications. Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit

the FBI's Information Technology system.[22] It is possible they could use this information to gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications. Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law. Accordingly, the FBI asserted Exemption 7(E) to withhold this information.

### (b)(7)(E): Types and Timing of Investigations

100.    Pursuant to Exemption (b)(7)(E), the FBI withheld information pertaining to the types and dates of investigations referenced in the records at issue in this case. Specifically, some of the information withheld, when referenced in connection with actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation and the dates the FBI initiated the investigations. Disclosure of this information can significantly undermine law enforcement efforts and national security. Such information allows individuals to manipulate their behavior to avoid detection during critical periods, knowing when to appear compliant and when they are not under intense scrutiny.

101.    Furthermore, understanding the types and timing of investigations could enable individuals to coach others or prepare themselves to deceive investigators effectively. This

---

[22] As recently as July 27, 2023, FBI Denver's Field Office warns of a telephone spoofing scam where callers impersonate FBI agents and display the FBI's Colorado Spring's main phone number on caller ID. Victims are told their identity or bank accounts are compromised and instructed to move their money to gift cards or cryptocurrency, which the scammers then steal. *See*: https://www.fbi.gov/contact-us/field-offices/denver/news/fbi-denver-warns-of-scam-spoofing-fbi-phone-number, last accessed July 18, 2024.

knowledge provides an opportunity to alter their activities strategically, temporarily ceasing any suspicious behavior or associations. Foreign adversaries, upon learning the timing and depth of these investigations, might exploit the information to place operatives in sensitive positions, appearing compliant only during the investigative window. They could also time their activities to align with periods of reduced scrutiny, thus avoiding detection. Additionally, this information could be used to identify and exploit procedural weaknesses within the investigative process, enabling future subjects to manipulate or circumvent security measures. This not only threatens the integrity of the background investigation but also endangers national security by potentially allowing individuals with malicious intent to infiltrate sensitive areas of government.

102.    In summary, disclosure of information related to the types and timing of investigations could enable criminals to time and structure their illegal activities accordingly to circumvent the FBI's attempts to enforce federal laws; therefore, the FBI has properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E): Database Information and Search Results

103.    Pursuant to Exemption (b)(7)(E), the FBI withheld the identities of sensitive investigative databases and database search results located through queries of these non-public databases used for official law enforcement purposes by the FBI. Releasing the identities of these databases and any information located through queries of these databases would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations (*i.e.*, the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases).

104.    Revealing the use of these databases in the context of FBI investigative records,

and the information generated through queries of these databases, would reveal the nature of their utility to FBI investigators and the scope of information stored within the databases. Disclosing when and why the FBI queries these databases would reveal key information about FBI investigative strategies. This is because different investigative databases contain varying datasets, and revealing the types of data sought by investigators in particular investigative circumstances would reveal the FBI strategies employed in response to different investigative circumstances. Additionally, disclosing the search results for particular subjects would provide criminals with an understanding of the scope of FBI collected intelligence on particular subjects. It would expose possible intelligence gaps and/or intelligence gathering strengths. This would allow criminals to make informed decisions on how they might structure their behavior to exploit these strengths and weaknesses, and avoid detection and/or disruption by the FBI.

105.    Revealing the types of information stored in these databases would also reveal the types of information most useful to FBI investigators. This would provide criminals with an understanding of how they might structure their behavior and/or deploy countermeasures to deprive the FBI of useful intelligence/evidence, thus jeopardizing the FBI's investigative mission.

106.    Finally, revealing the identities of these databases could jeopardize the FBI's investigative mission by revealing exactly where the FBI is storing and obtaining valuable investigative data. Knowing the database names makes the original source data an attractive target for compromise. It would allow criminals who gain access to FBI systems an idea of where they can go to discover what the FBI knows, how it gathered the information, and possible information regarding the FBI's investigative strategies. It would also offer these criminals the opportunity to corrupt or destroy information stored within these databases.

56

107. In summary, release of the identities of sensitive investigative databases and database search results would impede the FBI's effectiveness and potentially aid in circumvention of valuable investigative techniques. Therefore, the FBI withheld this information pursuant to Exemption 7(E).

### (b)(7)(E): Coordination with Other Government Agencies and State/Local Law Enforcement Agencies

108. Pursuant to Exemption (b)(7)(E), the FBI withheld coordination with Other Government Agencies (OGAs) and State/Local Law Enforcement Agencies pertaining to information referenced in the records at issue. Revealing this information would reveal the FBI located information on the subject matter relevant to the investigative purview of OGAs and State/Local Law Enforcement Agencies. Release of this information in the context of these records would reveal which types of investigative data the FBI deems relevant enough to refer to or collaborate with certain OGAs or State/Local Law Enforcement Agencies for further investigation. This would allow criminals to structure their behavior to avoid investigative triggers that would initiate an investigative referral from the FBI to its partners, and investigative scrutiny by additional government agencies or State/Local Law Enforcement Agencies. Additionally, release of this information could reveal which agencies cover specific types of investigative or intelligence matters. Repeated release of this type of information would enable criminals to predict and circumvent FBI investigative coordination with its government partners, state/local partners, and circumvent the law enforcement purpose of these partnerships and information sharing techniques. Accordingly, the FBI properly asserted Exemption 7(E) to withhold this type of information.

### (b)(7)(E): Investigative Search Slips

109. Pursuant to Exemption (b)(7)(E), the FBI withheld investigative search slips

57

detailing the FBI's file checks for the purpose of identifying subjects in a criminal investigation and/or national security information. Investigative search slips contain identifying information, including but not limited to, full name, alias, race, sex, weight, height, date of birth, place of birth, social security number, address/locality, telephone number, FBI Number and/or identifiers specific to the subject-matter and/or associated with a specific event searched. An investigative search slip may also contain details of where the FBI searched to locate potentially responsive material, the date of the search, FBI personnel names/initials, and specific details concerning potentially responsive material located through its search, such as file numbers and the current status of files (i.e., ongoing or closed investigation). To provide the details contained in FBI search slips and search printouts could identify classified or sensitive files numbers that reveal the file classification (type of investigation) and field office location involved with specific investigations. Additionally, this material could reveal the number of investigations pertaining to a particular subject/event of investigation to the FBI and/or law enforcement.  In other words, the search slips provide an investigative roadmap revealing the size, nature, location(s), sensitivity, classification, and the status of a particular investigative subject/event. Moreover, even the release of small pieces of information from search slips and search printouts could establish a pattern or "mosaic" which would allow targets to avoid or circumvent specific locations, especially if one or more location appeared with frequency on a search slip or printout concerning a specific subject of investigation. Once this information is identified, the field office with expertise in a particular type of investigation would be known to targets. This knowledge could allow a subject to employ countermeasures targeted toward concealing particular types of behavior and/or to avoid altogether activities in a particular location to avoid detection. Lastly, the release of file numbers associated with a particular subject/event could also reveal

classified/sensitive source file numbers associated with particular investigations and/or field office locations which could harm the FBI's informant program. Accordingly, the FBI properly withheld these investigative search slips pursuant to FOIA Exemption 7(E).

FORESEEABLE HARM STANDARD

110.    The FOIA Improvement Act of 2016 generally adopted the *foreseeable harm standard* and made it statutory, advising that agencies shall withhold information under the FOIA only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption or disclosure is prohibited by law. Accordingly, the FBI's analysis of records responsive under the FOIA is a two-part process. First, the FBI determines whether a record is exempt pursuant to one or more FOIA exemptions. Second, if the record is exempt pursuant to one or more FOIA exemptions, the FBI then considers whether foreseeable harm would result from disclosure of the record. For the withheld records at issue here, the FBI conducted this two-part analysis and only withheld records where it determined the withheld record met both of these criteria. The FBI's foreseeable harm is more fully described within each of the above exemption justification categories.[23]

**SEGREGABILITY**

111.    All documents responsive to Plaintiff's request and subject to the FOIA were processed to achieve maximum disclosure consistent with the access provisions of the FOIA. The FBI determined that 115 pages of public source material could be segregated and released to Plaintiff. The remaining responsive records are categorially exempt pursuant to FOIA

-------

[23] 5 U.S.C. § 552(a)(8)(A)(i)(II) does not impose a requirement to articulate harm for Exemption (b)(3).

Exemptions 5, 6, and 7(C) as well as the underlying exemptions discussed *supra*.

112.    As discussed in ¶ 23 *supra*, the FBI identified 115 pages of public source material that could be segregated for disclosure. Of these, 111 pages were released in full and 4 were released in part. The FBI determined that 111 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA Exemption. Additionally, the FBI determined that 4 pages could be released in part with redactions per FOIA Exemptions (b)(6) and (b)(7)(C). The FBI determined disclosure of the withheld information on these 4 pages would trigger foreseeable harm to one or more interests protected by the exemption.

## CONCLUSION

113.    The FBI performed adequate and reasonable searches for responsive records subject to the FOIA, processed all such records, and released all reasonably segregable non-exempt information from documents responsive to Plaintiff's FOIA request. Information was properly categorically withheld pursuant to FOIA Exemptions 5, 6, and 7(C) and portions of the records were withheld pursuant to one or more of the underlying FOIA Exemptions 1, 3, 5, 6, 7C, 7D, and 7E, as disclosure of this information would reveal classified information; would reveal statutorily protected information; would reveal privileged information, would cause a clearly unwarranted invasion of personal privacy, or could reasonably be expected to constitute and unwarranted invasion of personal privacy; could reasonably be expected to disclose the indent of a confidential source; and/or would disclose techniques and procedures for law enforcement investigations. After extensive review of the documents at issue, the FBI determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through G attached hereto are true and correct copies.

Executed this _____25th_____ day of July 2024.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia