UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FIRST LEGAL FOUNDATION, <br><br> Plaintiff, <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATION, et al., <br><br> Defendants. | Civil Action No. 23-2172 (BAH) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ERRATA[1]

Defendants, the Federal Bureau of Investigation and the Department of Justice, by and through undersigned counsel, hereby move for summary judgment pursuant to Federal Rule of Civil Procedure 56. In support of this motion, Defendants respectfully submit the attached memorandum.

Dated: July 26, 2024
      Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____/s/ Dedra S. Curteman_____
    DEDRA S. CURTEMAN, D.C. Bar #90021492
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2550

*Attorneys for the United States of America*

---

[1] This Errata corrects the previously filed Motion for Summary Judgment and supporting Memorandum which inadvertently referred to "Defendant," rather than "Defendants," including the Department of Justice as a Defendant.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FIRST LEGAL FOUNDATION,<br><br>        Plaintiff,<br><br>   v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br>et al.,<br><br>        Defendants. | Civil Action No. 23-2172 (BAH) |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Table of Authorities ........................................................................................................... ii

Background ......................................................................................................................... 1

Legal Standards .................................................................................................................. 3

Argument ............................................................................................................................ 4

    I.      The FBI Performed a Reasonable Search. ........................................................... 4

          A.      Applicable Standards. ............................................................................. 4

          B.      All Searches Were Reasonable and Legally Sufficient. ........................... 6

    II.     The FBI Properly Categorically Withheld Information Under FOIA Exemptions 5, 6, and 7(C). ....................................................................................................... 9

          A.      The Withholdings Pursuant to Exemption 5 Are Appropriate. ................ 13

          B.      The Withholdings Pursuant to Exemption 6 Are Appropriate. ................ 16

          C.      The Withholdings Pursuant to Exemption 7(C) Are Appropriate. ........... 19

    III.    The FBI Properly Applied Underlying FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E). ......................................................................................................... 22

          A.      The Withholdings Pursuant to Exemption 1 Are Appropriate. ................ 23

          B.      The Withholdings Pursuant to Exemption 3 Are Appropriate. ................ 25

          C.      The Withholdings Pursuant to Exemption 5 Are Appropriate. ................ 27

          D.      The Withholdings Pursuant to Exemption 6 and 7(C) Are Appropriate. . 28

          E.      The Withholdings Pursuant to Exemption 7(D) Are Appropriate. ........... 31

          F.      The Withholdings Pursuant to Exemption 7(E) Are Appropriate. ........... 32

    IV.    The FBI Released All Reasonably Segregable Information. ................................. 35

    V.     The FBI Determined that Foreseeable Harm Would Result From Any Disclosure. ....................................................................................................................... 36

Conclusion ......................................................................................................................... 37

# TABLE OF AUTHORITIES

Cases

*ACLU v. Dep't of Def.*,
628 F.3d 612 (D.C. Cir. 2011) ................................................................................. 23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................... 3

*Archibald v. Dep't of Just.*,
950 F. Supp. 2d 80 (D.D.C. 2013) ................................................................. 21, 22

*Bast v. Dep't of Just.*,
665 F.2d 1251 (D.C. Cir. 1981) .............................................................................. 20

*Beck v. Dep't of Just.*,
997 F.2d 1489 (D.C. Cir. 1993) .............................................................................. 17

*Billington v. Dep't of Just.*,
301 F. Supp. 2d 15 (D.D.C. 2004) .......................................................................... 31

*Blackwell v. FBI*,
646 F.3d 37 (D.C. Cir. 2011) ................................................................................. 33

*Brown v. Dep't of Just.*,
742 F. Supp. 2d 126 (D.D.C. 2010) ......................................................................... 6

*Campbell v. Dep't of Just.*,
164 F.3d 20 (D.C. Cir. 1998) ................................................................................. 20

*Chang v. Dep't of Navy*,
314 F. Supp. 2d 35 (D.D.C. 2004) ................................................................... 17, 29

*Citizens United v. Dep't of State*,
Civ. A. No. 18-1862, 2021 WL 32683835 (D.D.C. Jul. 29, 2021) .......................... 26

*Comm. for Freedom of Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ................................................................................. 37

*Consumers' Checkbook Ctr. for the Study of Servs. v. Dep't of Health & Hum. Servs.*,
554 F3d 1046 (D.C. Cir. 2009) .............................................................................. 21

*Davis v. Dep't of Just.*,
968 F.2d 1276 (D.C. Cir. 1992) .............................................................................. 20

*Dep't of Just. v. Landano*,
508 U.S. 165 (1993) ............................................................................................... 31

*Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) ................................................................................ 10, 20, 22

*Dep't of Just. v. Tax Analysts*,
    492 U.S. 136 (1989) ........................................................................................... 9

*Dep't of State v. Wash. Post Co.*,
    456 U.S. 595 (1982) ......................................................................................... 17

*Doe v. Dep't of Just.*,
    790 F. Supp. 17 (D.D.C. 1992) ........................................................................ 21

*Dow Jones & Co. v. Dep't of Just.*,
    908 F.2d 1006 (D.C. Cir. 1990) ....................................................................... 32

*Dep't of Def. v. Fed. Lab. Rels. Auth.*,
    510 U.S. 487 (1994) ............................................................................... 9, 19, 21

*Durant v. Dist. of Columbia*,
    875 F.3d 685 (D.C. Cir. 2017) ........................................................................... 3

*Fischer v. Dep't of Just.*,
    596 F. Supp. 2d 34 (D.D.C. 2009) .................................................................... 31

*Food Mktg. Inst. v. Argus Leader Media*,
    139 S. Ct. 2356 (2019) ..................................................................................... 20

*Founding Church of Scientology v. Nat'l Sec. Agency*,
    610 F.2d 824 (D.C. Cir. 1979) ........................................................................... 6

*Ghassan v. Dep't of Just.*,
    Civ. A. No. 22-1615 (RDM), 2023 WL 1815650 (D.D.C. Feb. 8, 2023) ................................ 3

*Gov't Accountability Project v. CIA*,
    633 F. Supp. 3d 171 (D.D.C. 2022) .................................................................... 4

*Greenberg v. Dep't of Treasury*,
    10 F. Supp. 2d 3 (D.D.C. 1998) .......................................................................... 5

*Hunt v. U.S. Marine Corps*,
    935 F. Supp. 46 (D.D.C. 1996) ................................................................... 17, 28

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ......................................................................... 14

*Juarez v. Dep't of Just.*,
    518 F.3d 54 (D.C. Cir. 2008) ........................................................................... 36

*Jud. Watch, Inc. v. Rossotti*,
  285 F. Supp. 2d 17 (D.D.C. 2003) ............................................................. 5

*Jud. Watch, Inc. v. Dep't of Just.*,
  365 F.3d 1108 (D.C. Cir. 2004) ............................................................. 14

*Kowalczyk v. Dep't of Just.*,
  73 F.3d 386 (D.C. Cir. 1996) ............................................................. 5, 6, 7

*Larson v. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009) ............................................................. 4, 26

*Lepelletier v. FDIC*,
  164 F.3d 37 (D.C. Cir. 1999) ............................................................. 17, 29

*Levinthal v. Fed. Elections Comm'n*,
  219 F. Supp. 3d 1 (D.D.C. 2016) ............................................................. 19

*Loving v. Dep't of Def.*,
  May550 F.3d 32 (D.D.C. 2008) ............................................................. 14

*Mayer Brown LLP v. IRS*,
  562 F.3d 1190 (D.C. Cir. 2009) ............................................................. 33

*McCutchen v. Dep't of Health & Hum. Servs.*,
  30 F.3d 183 (D.C. Cir. 1994) ............................................................. 9

*Media Rsch. Ctr. v. Dep't of Just.*,
  818 F. Supp. 2d 131 (D.D.C. 2011) ............................................................. 4

*Mead Data Cent., Inc. v. Dep't of Air Force*,
  566 F.2d 242 (D.C. Cir. 1977) ............................................................. 35

*Miller v. Casey*,
  730 F.2d 773 (D.C. Cir. 1984) ............................................................. 4

*Miller v. Dep't of Just.*,
  872 F. Supp. 2d 12 (D.D.C. 2012) ............................................................. 31

*Mittleman v. Off. of Pers. Mgmt.*,
  76 F.3d 1240 (D.C. Cir. 1996) ............................................................. 21

*Mobley v. Dep't of Just.*,
  870 F. Supp. 2d 61 (D.D.C. 2012) ............................................................. 23

*Morley v. CIA*,
  508 F.3d 1108 (D.C. Cir. 2007) ............................................................. 23

*Nat'l Archives & Records Admin. v. Favish*,
   541 U.S. 157 (2004) ........................................................................................... 21

*Nat'l Sec. Archive Fund, Inc. v. CIA*,
   402 F. Supp. 2d 211 (D.D.C. 2005) ................................................................. 35

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977) ........................................................................................... 14

*Nat'l Lab. Rel. Bd. v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ...................................................................................... 13, 27

*Oglesby v. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990) .............................................................................. 5

*Parker v. Dep't of Just.*,
   934 F.2d 375 (D.C. Cir. 1991) ........................................................................ 32

*Pratt v. Webster*,
   673 F.2d 408 (D.C. Cir. 1982) ........................................................................ 21

*Privacy Info. Ctr. v. Dep't of Just.*,
   296 F. Supp. 3d 109 (D.D.C. 2017) ................................................................. 23

*Pub. Citizen Health Rsch. Grp. v. FDA*,
   185 F.3d 898 (D.C. Cir. 1999) ........................................................................... 9

*Rockwell Int'l Corp. v. Dep't of Just.*,
   235 F.3d 598 (D.C. Cir. 2001) ...................................................................... 13, 27

*Roth v. Dep't of Just.*,
   642 F.3d 1161 (D.C. Cir. 2011) ....................................................................... 31

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ....................................................... 4, 5, 6, 10, 11

*Schaerr v. Dep't of Just.*,
   435 F. Supp. 3d 99 (D.D.C. 2020) ................................................................... 23

*Schrecker v. Dep't of Just.*,
   349 F.3d 657 (D.C. Cir. 2003), *af'd* 69 F.4th 924 (D.C. Cir. 2023) ................. 5

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*,
   740 F.3d 195 (D.C. Cir. 2014) ........................................................................ 20

*Shem-Tov v. Dep't of Just.*,
   531 F. Supp. 3d 102 (D.D.C. 2021) ................................................................... 3

*Shem-Tov v. Dep't of Just.*,
   Civ. A. No. 17-2452 (RDM), 2020 WL 2735613 (D.D.C. May 25, 2020) .............................. 3

*Stein v. CIA*,
   454 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................... 18, 19

*Steinberg v. Dep't of Just.*,
   23 F.3d 548 (D.C. Cir. 1994) ....................................................................................... 6

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ................................................................................. 36

*Tax Analyst v. IRS*,
   294 F.3d 71 (D.C. Cir. 2002) ..................................................................................... 20

*Tax Analysts v. IRS*,
   117 F.3d 607 (D.C. Cir. 1997) ..................................................................................... 6

*United States v. Nixon*,
   418 U.S. 683 (1974) ............................................................................................. 13, 14

*Weisberg v. Dep't of Just.*,
   627 F.2d 365 (D.C. Cir. 1980) ..................................................................................... 6

*Weisberg v. Dep't of Just.*,
   705 F.2d 1344 (D.C. Cir. 1983) ................................................................................... 4

*Weisberg v. Dep't of Just.*,
   745 F.2d 1476 (D.C. Cir. 1984) ................................................................................... 5

*Wildlife v. Dep't of Interior*,
   314 F. Supp. 2d 1 (D.D.C. 2004) ................................................................................. 5

*Wildlife v. U.S. Border Patrol*,
   623 F. Supp. 2d 83 (D.D.C. 2009) .............................................................................. 5

*Willis v. Nat'l Sec. Agency*,
   Civ. A. No. 17-2038 (KBJ), 2019 WL 1924249 (D.D.C. Apr. 30, 2019) .............................. 23

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ................................................................................. 9, 23

Statutes

5 U.S.C. § 552 ............................................... 1, 6, 9, 13, 17, 19, 20, 25, 27, 28, 29, 31, 33, 34, 36

5 U.S.C. § 552(b)(3) .................................................................................................... 25

5 U.S.C. § 552(b)(3)(A)(i) ............................................................................................ 25

50 U.S.C. § 3003(4) .................................................................................................... 26

50 U.S.C. § 3024 .......................................................................................................... 26

50 U.S.C. § 3024(i)(1) ................................................................................................. 26

U.S.C. § 552(b)(1) ....................................................................................................... 23

Plaintiff, the American First Legal Foundation, brought this Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, lawsuit on July 26, 2023, after seeking records from the Federal Bureau of Investigation ("FBI") concerning its background investigation of Alejandro Mayorkas for the position of the Secretary of the Department of Homeland Security. *See* Compl. (ECF No. 1) ¶ 13; Ex. B, Jan. 13, 2023, Response Letter. For the reasons explained below, the FBI, a component of the Department of Justice, has reasonably categorically withheld information in conjunction with FOIA Exemptions 5, 6, and 7(C), and has also reasonably withheld information pursuant to underlying Exemptions 1, 3, 7(D), and 7(E). Thus, pursuant to Federal Rule of Civil Procedure ("Rule") 56, this Court should grant summary judgment in favor of Defendants.

## BACKGROUND

Defendants hereby incorporate the accompanying Statement of Undisputed Material Facts, the Declaration of Michael G. Seidel ("Seidel Decl."), and the supporting Exhibits referenced therein. After the 2020 Presidential election, then President-Elect, Joseph R. Biden, Jr., designated an official from the Office of the President-Elect to request the initial full-field background investigation of Alejandro Mayorkas, and on December 1, 2020, that official initiated a Level I FBI background investigation. Seidel Decl. ¶ 25. The background investigation files that FBI compiled consisted of several types of information including the interviews of the appointee, their neighbors, references, employers, supervisors, and coworkers; searches and results of government agency database records checks; and medical and financial records detailing every aspect of the past health and financial history of Alejandro Mayorkas. *Id*. The information includes a wealth of personally identifiable information, as well as intimate details about the subject of the investigation, his family, personal relationships, and associates. *Id*. ¶ 26. The information can also reveal past criminal acts and behaviors occurring after the age of eighteen that are no longer public record. *Id*.

On January 6, 2023, Plaintiff submitted a FOIA request to the FBI seeking records pertaining to the FBI's background investigation of Alejandro Mayorkas for Senate confirmation as the Secretary for the Department of Homeland Security.  Seidel Decl. ¶ 5.  Plaintiff requested:

> 1.  All records and versions of the FBI background investigation, Form SF-86 and any supporting security clearance documentation, including waiver forms, that were both completed, regardless of completion date(s), by Alejandro Mayorkas or his designees for the purposes of allowing the FBI to conduct a background investigation as part of his nomination for Secretary of Homeland Security and as produced to or shared with Senate Homeland Security and Governmental Affairs majority staff or any other congressional staff.

> 2.  All records and versions of the FBI background investigation, Form SF-86 and any supporting security clearance documentation, including waiver forms, that were both completed, regardless of completion date(s), by Alejandro Mayorkas or his designees for the purposes of allowing the FBI to conduct a background investigation as part of his nomination for Deputy Secretary of Homeland Security and as produced to or shared with Senate Homeland Security and Governmental Affairs majority staff or any other congressional staff.

> 3.  All records and versions of the FBI background investigation, Form SF-86 and any supporting security clearance documentation, including waiver forms, that were both completed, regardless of completion date(s), by Alejandro Mayorkas or his designees for the purposes of allowing the FBI to conduct a background investigation as part of his nomination for Director of the United States Citizenship and Immigration Service and as produced to or shared with Senate Homeland Security and Governmental Affairs majority staff or any other congressional staff.

> 4.  All records and versions of the FBI background investigation, Form SF-86 and any supporting security clearance documentation, including waiver forms, that were both completed, regardless of completion date(s), by Alejandro Mayorkas or his designees for the purposes of allowing the FBI to conduct a background investigation as part of his nomination for United States Attorney for the Central District of California and as produced to or shared with Senate Homeland Security and Governmental Affairs majority staff or any other congressional staff.

*Id.*; *see also* Ex. A, Jan. 6, 2023, FOIA Request.  On January 13, 2023, the FBI informed Plaintiff that it had completed its search for records responsive to the request, that the requested records were categorically denied pursuant to FOIA Exemptions 6 and 7(C), that Plaintiff had not demonstrated the public's interest in disclosure outweighed the personal privacy interests of the individual's privacy interests, and that although the FBI acknowledged the existence of the records,

the records were exempt from disclosure as processing the records would constitute an unwarranted invasion of personal privacy.  Seidel Decl. ¶ 6; Ex. B.  Plaintiff appealed the FBI's response on April 14, 2023.  Seidel Decl. ¶ 7; Ex. C, Apr. 14, 2023, Appeal.  On June 16, 2023, the Office of Information Policy for the Department of Justice affirmed the FBI's actions in response to Plaintiff's FOIA Request.  Seidel Decl. ¶ 9; Ex. E, June 16, 2023, Response.  Plaintiff filed the instant action on July 26, 2023.  Compl. (ECF No. 1).

On March 29, 2024, the FBI advised Plaintiff that it had completed its review of responsive records for applicable FOIA Exemptions and for segregability.  Seidel Decl. ¶ 11.  In that response, the FBI told Plaintiff that it had identified 115 pages of segregable, public source information, which it released in part.  *Id*. ¶ 11.  The FBI also advised Plaintiff that all other responsive material was categorically exempt from disclosure pursuant to FOIA Exemptions 6 and 7(C), and underlying FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E).  *Id*.

## LEGAL STANDARDS

"FOIA cases are typically resolved on motions for summary judgment under" Rule 56. *Ghassan v. Dep't of Just.*, Civ. A. No. 22-1615 (RDM), 2023 WL 1815650, at *2 (D.D.C. Feb. 8, 2023).  Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is warranted if the plaintiff has failed to 'present affirmative evidence . . . to defeat a properly supported motion for summary judgment.'" *Durant v. Dist. of Columbia*, 875 F.3d 685, 696 (D.C. Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

"An agency [typically] proves its entitlement to summary judgment through affidavits or declarations, including a *Vaughn* index, explaining its searches and withholdings."  *Shem-Tov v. Dep't of Just.*, 531 F. Supp. 3d 102, 108 (D.D.C. 2021) (quoting *Shem-Tov v. Dep't of Just.*, Civ.

A. No. 17-2452 (RDM), 2020 WL 2735613, at *4 (D.D.C. May 25, 2020)).  More specifically, "[s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *Gov't Accountability Project v. CIA*, 633 F. Supp. 3d 171, 176 (D.D.C. 2022) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  *Media Rsch. Ctr. v. Dep't of Just..*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

Courts give agency declarations "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'"  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted).

## ARGUMENT

## I.     The FBI Performed a Reasonable Search.

Plaintiff made a request on January 6, 2023, for the FBI's background investigation of Alejandro Mayorkas in connection with his then pending Presidential appointment to the position of Secretary for the Department of Homeland Security.  Given Plaintiff's request for background investigation materials, the FBI reasonably searched its Central Records Systems, which given the comprehensive nature of the information contained therein, *see* Seidel Decl. ¶ 13, the Central Records Systems is the FBI system where responsive records would reasonably be expected to be found.  *Id*. ¶ 12.

### A.     Applicable Standards.

Under FOIA, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents."  *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  A

search is not inadequate merely because it failed to "uncover[] every document extant." *SafeCard*, 926 F.2d at 1201; *see also Jud. Watch, Inc. v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (noting that "[p]erfection is not the standard by which the reasonableness of a FOIA search is measured"). An agency may search for responsive records in the way its records systems are indexed. *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998).

Where an agency affidavit attests that a reasonable search was conducted, the agency is entitled to a presumption of good faith. *Defs. of Wildlife v. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004). FOIA does not require that an agency search every division or field office on its own initiative in response to a FOIA request if responsive documents are likely to be located in a particular place. *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996). Nor does FOIA require an agency search every record system. *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.D.C. 1990).

"To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009). However, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis omitted). The process of conducting an adequate search for documents requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and it is "hardly an area in which the courts should attempt to micro manage the executive branch." *Schrecker v. Dep't of Just.*, 349 F.3d 657, 662 (D.C. Cir. 2003).

"[T]he sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" for summary judgment in the agency's favor to be inappropriate based on the adequacy

of the search. *Weisberg v. Dep't of Just.*, 627 F.2d 365, 370 (D.C. Cir. 1980) (quoting *Founding Church of Scientology v. Nat'l Sec. Agency,* 610 F.2d 824, 836 (D.C. Cir. 1979)). A plaintiff "cannot rebut the good faith presumption" afforded to an agency's supporting affidavits "through 'purely speculative claims about the existence and discoverability of other documents.'" *Brown v. Dep't of Just.*, 742 F. Supp. 2d 126, 129 (D.D.C. 2010) (quoting *SafeCard*, 926 F.2d at 1200); *see also Steinberg v. Dep't of Just.*, 23 F.3d 548, 552 (D.C. Cir. 1994) ("mere speculation that as yet uncovered documents may exist" is insufficient to defeat summary judgment).

Moreover, in responding to a FOIA request, an agency looks to the "reasonabl[e] descri[ption]" of the records sought. 5 U.S.C. § 552(a)(3)(A). That is, a professional agency employee familiar with the subject area must, in light of the FOIA request framed by the requestor, be able to locate the requested records with a "reasonable amount of effort." H.R. Rep. No. 93-876, at 6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6271. The agency must be able to determine "precisely" which records are being requested. *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997). An agency is "not obliged to look beyond the four corners of the request for leads to the location of responsive documents." *Kowalczyk*, 73 F.3d at 389.

### B.    All Searches Were Reasonable and Legally Sufficient.

#### 1.    Organization of FBI's Central Records System.

As background, to locate potentially responsive records, FBI's Record/Information Dissemination Section conducted a search of FBI's Central Records System, which is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by FBI in the course of fulfilling its mission and integrated functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions. Seidel Decl. ¶ 13. The Central Records System spans the entire FBI organization and encompasses the records of FBI Headquarters, FBI

field offices, and FBI Legal Attaché offices worldwide.  *Id.*  The Central Records System consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories.  *Id.* ¶ 14.  For identification and retrieval purposes across FBI, when a case file is opened, it is assigned a universal case file number consisting of three sequential components: (a) the Central Records System file classification number; (b) the abbreviation of FBI office of origin initiating the file; and (c) the assigned individual case file number for that particular subject matter.[2]  *Id.*  Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order.  *Id.*

The general indices to the Central Records System, comparable to a digital version of a library card catalog, function as the key to locating records within the enormous amount of information contained in the Central Records System.  *Id.* ¶ 15.  FBI personnel index information in the Central Records System by individual (person), organization (entity, place, or thing), or activity or event (e.g., terrorist attack or bank robbery) when information is deemed of sufficient significant indexing for future retrieval.  *Id.*  The entries in the general indices fall into two category types: main and reference.  *Id.*  A main index entry is created for each individual or non-individual that is the subject or focus of an investigation and the main subject(s) is identified in the case title of a file.  *Id.*  A reference index entry is created for individuals or non-individuals associated with an investigation but not the main subjects or focus of the investigation.  *Id.*  Reference subjects are typically not identified in the case title of a file.  *Id.*

---

[2]    For example, in a fictitious file number of "11Z-HQ-56789," the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI office of origin, and "56789" is the assigned case specific file number.

FBI personnel access the general indices through Sentinel, the FBI's case management system since July 1, 2012. *Id*. ¶ 16. Prior to Sentinel, FBI personnel utilized the Automated Case Support system. *Id*. On August 1, 2018, Automated Case Support was decommissioned, and its data was migrated into Sentinel, where these indices are accessible and searchable through Sentinel's search function. *Id*. FBI personnel rely on Sentinel to locate records and other types of documents to fulfill essential functions, such as: conducting criminal, counterterrorism, and national security investigations; conducting background investigations; performing citizenship and employment queries; and administering security screenings, to include presidential protection. *Id*. ¶ 17. Sentinel's index search methodology and function allow FBI personnel to query the Central Records System for indexed subjects in case files. *Id*. The location of records indexed to the subject of a FOIA request does not automatically mean the indexed records are responsive. *Id*. ¶ 18. Index searches are used to locate potentially responsive records, but ultimately, a FOIA analyst must consider potentially responsive indexed records against the specific parameters of individual requests. *Id*. Responsiveness is determined once indexed records are gathered, analyzed, and sorted by FOIA analysts who then make scoping decisions to determine the total pool of records responsive to a request. *Id*.

2. <u>Search Actions Undertaken by the FBI.</u>

Due to the nature of Plaintiff's request for records pertaining to the FBI's background investigation of Alejandro Mayorkas, the FBI determined that a search of the Central Records System's automated indices, available within Sentinel via the Sentinel and Automated Case Support system's search function and the manual indices, accessed via Sentinel, represented the most reasonable means for the FBI to locate records potentially responsive to Plaintiff's FOIA Request. *Id*. ¶ 19. That is because as described previously, the general indices provide access to a comprehensive, agency-wide set of indexed data on a broad ray of investigative and

administrative subjects and consist of millions of searchable records that are updated daily with newly indexed information. *Id*. Therefore, in response to Plaintiff's FOIA Request, the FBI conducted a search for main entries, or entries created for each individual that is the subject or focus of an investigation, in the Sentinel and the Automated Case Support system via Sentinel's search function. *Id*. ¶ 20. The FBI searched the indices using the term "Alejandro Mayorkas" with a search cut-off date of September 22, 2023, which is the date of the FBI's initial search for records. *Id*. The FBI located responsive records as a result for the search. *Id*. Plaintiff provided no information for the FBI to reasonably conclude that responsive records would reside outside of the Central Records System. *Id*. ¶ 21. And there is no indication from the FBI's search efforts that responsive records would reside in any other FBI system or location. *Id*. On these bases, the Court should conclude that the FBI conducted a reasonable search for potentially responsive records.

## II.    The FBI Properly Categorically Withheld Information Under FOIA Exemptions 5, 6, and 7(C).

FOIA does not allow the public to have unfettered access to government files. *McCutchen v. Dep't of Health & Hum. Servs.*, 30 F.3d 183, 184 (D.C. Cir. 1994). Although disclosure is the dominant objective of FOIA, there are several exemptions to the statute's disclosure requirements. *Dep't of Def. v. Fed. Lab. Rels. Auth. ("FLRA")*, 510 U.S. 487, 494 (1994). FOIA requires that an agency release all records responsive to a properly submitted request unless such records are protected from disclosure by one or more of the Act's nine exemptions. 5 U.S.C. § 552(b); *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150–51 (1989). To protect materials from disclosure, the agency must show that they come within one of the FOIA exemptions. *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473

F.3d 370, 374–75 (D.C. Cir. 2007).  In appropriate cases, FOIA exemptions can be applied categorically.  The Supreme Court has explained that "categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction."  *Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989).  For example, in *Reporters Committee*, plaintiff "sought disclosure of any arrests, indictments, acquittals, convictions, and sentences" of four individuals with organized-crime associations.  *Id.* at 757.  The Court held that such "rap sheet" information was categorically protected by Exemption 7(C).  *See id.* at 780 ("[W]e hold as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy[.]").

The D.C. Circuit further clarified the scope of the third-party categorical exemption in *SafeCard*, 926 F.2d 1197.  The plaintiff in *SafeCard* sought documents related to an SEC investigation, and, pursuant to Exemption 7(C), the agency "deleted the names and addresses of third parties mentioned in witness interviews, of customers listed in stock transaction records . . ., and of persons in correspondence with the SEC."  *Id.* at 1205.  The Circuit affirmed these redactions, holding "categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."  *Id.* at 1206.

In making its categorical denial of production of records, the FBI categorized the various types of exempt records into three categories: (1) Evidentiary and Investigative Materials; (2) Administrative Materials; and (3) Public Source Materials.  Seidel Decl. ¶ 45.  The first two of these categories are outlined in the chart within the Seidel Declaration.  *Id.*  The first category,

Evidentiary and Investigative Materials includes copies of records or evidence, analyses of evidence, and derivative communications discussing or incorporating collected evidence. *See Seidel Decl.* (first chart on pp. 23-24). A derivative communication describes, verbatim or in summary, the contents of the original record, how it was obtained, and how it relates to the investigation. *See id.* Other derivative communications report this information to other FBI field offices, other law enforcement agencies, or other Federal agencies, either to advise them about the progress of the investigation, or to elicit their assistance in handling investigative leads. *See id.* The second category, Administrative Materials includes items such as case captions, serial numbers, identities of FBI field offices, dates of investigations, and detailed instructions designed to ensure that investigative procedures are conducted within the appropriate FBI and DOJ guidelines. *See Seidel Decl.* (second chart on pp. 24-25). The third category, Public Source Materials, consists of pertinent articles in newspapers, magazines, or other periodicals, which were placed by FBI employees into the investigative file. *Id.* ¶¶ 45, 47. The FBI released the public source materials consisting of articles about or written by Mr. Mayorkas. *Id.* ¶ 48. The FBI determined that of four released in part pages of this material, the name of the FBI Special Agent was exempt from disclosure pursuant to Exemptions 6 and 7, which is explained in greater detail below. *Id.*

As examples of the first functional category, the FBI has included two subcategories of information: (1) Information Provided by Interview Subjects and (2) Information Concerning Physical or Documentary Evidence. *See id.* at 23-24 (first chart). Background investigation files comprise the first subcategory and typically contain information provided by interview subjects, such as the appointee, personal references, neighbors, and prior employment contacts. *See id.* Interview statements often form the basis for defining the personal character and qualifications of

the third-party subjects.  *See id.*

As to the second subcategory—Information Concerning Physical or Documentary Evidence—this subcategory contains a myriad of personal data about third parties gathered during routine investigative activities and would reveal information well beyond what is publicly known about the FBI's investigation of third parties.  *See id.*  For the second functional category, Administrative Materials, the FBI has compiled three subcategories of information: (1) Reporting Communications; (2) Miscellaneous Administrative Documents; and (3) Administrative Instructions.  *See* Seidel Decl. at 23-25 (second chart).  Reporting Communications permit an agency to monitor the progress of background investigations and to facilitate its conduct.  *See id.* These communications have the potential to reveal or confirm the cooperation of other local, state, and federal government agencies who assisted in the investigations and are replete with detailed information about the FBI's investigative activities as well as about potential interview subjects. *See id.*  Miscellaneous Administrative Documents include items such as transmittal forms and standardized forms used for a variety of purposes and are used throughout background investigations for many routine purposes.  *See id.*  Administrative Instructions are self-explanatory. *See id.*  To explain why the FBI determined that the background investigatory files were categorically exempt, it also included descriptions of the types and categories of documents that exist within the background investigation records.  *See* Seidel Decl. ¶ 46.

A third chart in the Seidel Declaration (at 26-28) contains various descriptions of types of records that are found within the background investigation file, along with the corresponding functional category.  As an example, electronic mail messages (or emails), are documents found within the background investigation file, and consist of emails between FBI personnel, between FBI personnel and private citizens or corporations, between FBI personnel and other government

agency personnel, or between FBI personnel and state and local law enforcement agencies. *See id*. These types of documents fit within both functional categories—Evidentiary and Investigative Materials and Administrative Materials. *See id*. Other types of documents are described in the third chart, including: internal FBI forms called "FD-302s; electronic communications; memoranda and letter correspondence; and FBI records checks, to name a few, and are described in the chart and are categorized by type of functional category. *See id*. The Mayorkas background investigation file which consists of these various types of documents and consists of both functional categories are categorically exempt from disclosure under FOIA Exemptions 5, 6, and 7(C).

###    A.    The Withholdings Pursuant to Exemption 5 Are Appropriate.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption shields documents of the type that would be privileged in the civil discovery context, including materials protected by the attorney-client, attorney work-product, confidential commercial information, and deliberative-process privileges. *Nat'l Lab. Rel. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *Rockwell Int'l*, 235 F.3d at 602. The FBI's withholdings of its background investigation of Mr. Mayorkas under Exemption 5 invoke the presidential communications privilege. *See* Seidel Decl. ¶¶ 24, 29.

The presidential communications privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974). The privilege applies to "communications that directly involve the President," as well as "communications authored or solicited and received by [] members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which

the communications relate." *In re Sealed Case*, 121 F.3d 729, 751–52 (D.C. Cir. 1997). In particular, the privilege applies "to communications in performance of (a President's) responsibilities, . . . and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (citations omitted). The privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.D.C. 2008); *see Nixon*, 418 U.S. at 708 (describing the privilege as a "presumptive privilege for [p]residential communications"). Unlike the deliberative process privilege, the presidential communications privilege "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones." *In re Sealed Case*, 121 F.3d at 745. The presidential communications privilege thus is a broader privilege that provides greater protection against disclosure. *Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1114 (D.C. Cir. 2004). Under Article II Section 2 of the United States Constitution, it is the President's responsibility to "nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States[.]" Art. II, Sect. 2, U.S. Constitution. *See also* Seidel Decl. ¶ 29.

As explained in the Seidel Declaration, the FBI has invoked Exemption 5 to withhold information contained within the background investigation files of Mr. Mayorkas. *See* Seidel Decl. ¶ 24. The FBI's background investigation of Mr. Mayorkas was made while preparing information or advice for potential presentation to the President (or President-Elect) on matters of presidential decision-making or—in some cases—confidential communications directly with the President (or President-Elect) on matters of presidential decision-making. As noted in the Seidel Declaration, to assist the President-Elect with his decision making, the Department of Justice

entered into a revised Memorandum of Understanding with then President-Elect Joseph R. Biden, Jr. on November 24, 2020, regarding the FBI background investigations of candidates for high-level national security positions in a new presidential administration. *Id.* ¶ 31; Ex. G, Memorandum of Understanding. The background files at issue in the present case, were requested on behalf of, and provided to, the Office of the President-Elect to assist the President-Elect in a fundamental matter of Presidential decision-making—whether to nominate Mr. Mayorkas as Secretary of the Department of Homeland Security, or some other high-level national security position in the new presidential administration. *See id.* ¶ 32.

Although the background files were requested before President Biden was sworn in as President Biden, Mr. Mayorkas was not confirmed by the Senate as Secretary of the Department of Homeland Security until February 2, 2021. *See id.* Therefore, President Biden continued to rely on the information contained in the background investigation files to continue to support Mr. Mayorkas' nomination once President Biden was sworn in as President. *See id.* And the background investigation files relate to a decision only President Biden (or any President) could make—whether to nominate Mr. Mayorkas for a cabinet position and whether he was qualified to hold a security clearance. *See id.* The materials are therefore covered by the presidential communications privilege.

Further, disclosure of this material would inhibit the President's ability to seek and obtain candid information. *See id.* If future President-Elects or candidates for high level national security positions knew that the background investigation files could be made public under FOIA, that would have a chilling effect on a President-Elect's ability to successfully recruit highly qualified individuals for these positions and harm the President's decision-making process, which the presidential communications privilege is intended to protect. *See id.* Accordingly, the FBI

concluded that these materials fall squarely within the protections afforded by the presidential communications privilege and must be withheld in full. *See id.* Because the FBI concluded that the privilege applies to the materials in their entirety, no segregation is possible. *See id.* Accordingly, the background investigation files were withheld in full pursuant to Exemption 5 in conjunction with the presidential communications privilege. *See id.*

For this category of information, "potential presidential decision-making" is defined only to include those communications for which the principal purpose of the communication was to prepare for potential Presidential decisions that could be made only after the President was sworn in as President. *See id.* ¶ 33. The withheld information was transmitted to the Biden Presidential Transition team and pursuant to Section 5(a) of the Memorandum of Understanding, the background investigation files were transmitted to and viewed by only people on the Biden Transition team "directly involved in . . . making a determination as to Mayorkas' suitability for" employment, appointment, recognition, or trustworthiness for access to sensitive or classified information. *See id.* *See also* Ex. G, at 4. Further, because all the withheld material was sent to the Office of the President-Elect to assist the President-Elect in determining if Mr. Mayorkas should be nominated for a high-level national security position and the viewing of it was restricted to only people the President-Elect entrusted with advising in such decisions, it was determined that all of the material falls under the presidential communications privilege. *See* Seidel Decl. ¶ 33. Thus, the Court should find that the FBI properly invoked the presidential communication privilege to the FBI's background investigation of Mr. Mayorkas and withheld the background investigation in its entirety.

### B.    The Withholdings Pursuant to Exemption 6 Are Appropriate.

Exemption 6 permits the withholding of "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of

personal privacy." 5 U.S.C. § 552(b)(6). The term "similar files" is broadly construed and includes "[g]overnment records on an individual which can be identified as applying to that individual." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982); *Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999) ("The Supreme Court has interpreted the phrase 'similar files' to include all information that applies to a particular individual."). In assessing the applicability of Exemption 6, courts weigh the "privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy." *Lepelletier*, 164 F.3d at 46; *Chang v. Dep't of Navy*, 314 F. Supp. 2d 35, 43 (D.D.C. 2004). "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier*, 164 F.3d at 47; *Beck v. Dep't of Just.*, 997 F.2d 1489, 1492 (D.C. Cir. 1993). "Information that 'reveals little or nothing about an agency's own conduct' does not further the statutory purpose." *Beck*, 997 F.2d at 1492.

Here, the files fit within the definition of "personnel and medical files and similar files" because the background files are maintained by the FBI as a government agency which investigated Mr. Mayorkas. *See Wash. Post Co.*, 456 U.S. at 602; *Hunt v. U.S. Marine Corps*, 935 F. Supp. 46, 54-55 (D.D.C. 1996) (finding Exemption 6 applied to records that included, *inter alia*, information about security clearances). Consistent with Exemption 6, the FBI balanced the public interest in disclosure against Mr. Mayorkas' substantial privacy interests. More specifically, the FBI considered that the background investigation of Mr. Mayorkas detailed the life events of a significant portion of his life, and as such, Mr. Mayorkas maintained a substantial interest in the nondisclosure of his personal information regardless of his resulting success in obtaining a

Presidential appointment and approval to access or limited access to classified government information.  *See* Seidel Decl. ¶ 39.

The background investigation files that the FBI compiled consisted of several types of personal information including the interviews of the appointee, his neighbors, references, employers, supervisors, or coworkers; searches and results of government agency database records checks; and medical and financial records detailing every aspect of the past health and financial history of Alejandro Mayorkas.  *See id*. *¶ 25.*  The background investigation file includes a wealth of personally identifiable information, as well as intimate details about the subject of the investigation, his family, personal relationships, and associates.  *See id*. ¶ 26.  Due to the personal nature of the background investigation file, the FBI considered Mr. Mayorkas' substantial privacy interest in the personal information on the records the FBI compiled, including information about his private life, and that disclosure of this information would constitute a massive intrusion into his personal privacy.  *See id*. ¶ 41.  *See also Stein v. CIA,* 454 F. Supp. 3d 1, 30 (D.D.C. 2020) ("records of an individual's security clearance implicate a 'substantial privacy interest' because they "reveal significant personal data about the individual."); *Hunt*, 935 F. Supp. At 54 ("[T]here can be no reasonable dispute that an individual] has a privacy interest in in maintaining their confidentiality.").

Against this substantial privacy interest, the FBI also considered the public's right to know, and considered that there was no evidence of any wrongdoing or impropriety by the FBI or other federal government agency concerning the background investigation process and that Plaintiff had failed to provide sufficiently compelling evidence showing how disclosure of this type of information or records would benefit the public's understanding of government operations enough to outweigh Mr. Mayorkas' privacy interests.  *See id*. ¶¶ 41, 43.  As to the public interest prong

relevant for the Exemption 6 analysis, "the only relevant public interest is the extent to which the records would 'contribut[e] significantly to the public understanding of *the operations or activities of the governmen*t.'"  *Stein*, 454 F. Supp. 3d at 30 (quoting *FLRA*, 510 U.S. at 495) (emphasis in original)).  Indeed, Plaintiff, in its complaint, suggests only that "the background of the Secretary of Homeland Security is assuredly a matter of actual or alleged Federal Government Activity.  *See* Compl. (ECF No. 1), Ex. 1, Jan. 6, 2022, FOIA Request, at 7.[3]  At the time the FBI conducted the background investigation, Mr. Mayorkas had not become the Secretary of the Department of Homeland Security, and as such, the FBI's background investigation centered on Mr. Mayorkas' private life, prior to his time as Secretary of the Department of Homeland Security.  As noted in the Seidel Declaration, on balance, the FBI reasonably determined that the private details of Mr. Mayorkas' life obtained during an authorized background investigation should remain private.  *See* Seidel Decl. ¶ 41.  The FBI's conclusion is consistent with Exemption 6 and as such, should be upheld by this Court.

## C.    The Withholdings Pursuant to Exemption 7(C) Are Appropriate.

To establish the applicability of any subparts of FOIA Exemption 7, the government must first show that the records at issue were "compiled for law enforcement purposes.'"  5 U.S.C. § 552(b)(7).  A record is "compiled for law enforcement purposes" within the meaning of Exemption 7 "so long as there is (1) a rational 'nexus' between the record and the agency's law enforcement duties, and (2) a connection between the subject of the record and a possible security risk or violation of federal law."  *Levinthal v. Fed. Elections Comm'n,* 219 F. Supp. 3d 1, 6 (D.D.C. 2016) (citing *Campbell v. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998)).  Further,

---

[3]    The pagination of the Exhibits attached to Plaintiff's Complaint refers to the pagination referenced in the header of each page.

where, as here, "the agency's principal function is law enforcement, courts are 'more deferential' to the agency's claimed purpose for the particular records." *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 203 (D.C. Cir. 2014) (quoting *Tax Analyst v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002)).  Exemption 7(C) exempts "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).   In applying Exemption 7(C), a court should "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Davis v. Dep't of Just.*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).  However, as under Exemption 6, courts recognize the considerable stigma inherent in being associated with law enforcement proceedings and accordingly "do[] not require a balance tilted emphatically in favor of disclosure" when reviewing a claimed 7(C) exemption.  *Bast v. Dep't of Just.,* 665 F.2d 1251, 1254 (D.C. Cir. 1981).  To the contrary, the Supreme Court has explicitly rejected the argument that "FOIA exemptions should be narrowly construed," reasoning that "FOIA expressly recognizes that 'important interests [are] served by [its] exemptions,' and '[t]hose exemptions are as much a part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirement.'" *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (citations omitted; alterations in original).  A court need only consider the withholdings under Exemption 6 if it concludes that Exemption 7(C) does not apply to any withholdings.  *See Reps. Comm.*, 489 U.S. at 762 n.12.

The records at issue in this case meet the requirements for Exemption 7(C).  As the D.C. Circuit has recognized, "[t]he principal purpose of a background investigation is to ensure that a prospective employee has not broken the law or engaged in other conduct making [him] ineligible for the position, [that] information obtained during [the Office of Personnel Management's]

background investigation was compiled for law enforcement purposes." *Mittleman v. Off. of Pers. Mgmt.*, 76 F.3d 1240, 1243 (D.C. Cir. 1996).  Similarly, the documents withheld by the FBI in this case relate to the Level I FBI background investigation conducted by the FBI for Secretary Mayorkas.  *See* Seidel Decl. ¶¶ 25.  The purpose of the background investigation was to determine if Mr. Mayorkas was suitable for a high-level national security position and to access sensitive law enforcement or classified information.  *See id*. ¶ 35.  Further, that the records were compiled for a law enforcement purpose by the FBI, which is a law enforcement agency, is entitled to deference. *See Doe v. Dep't of Just.*, 790 F. Supp. 17, 20 (D.D.C. 1992) (citing *Pratt v. Webster*, 673 F.2d 408, 414, 418-19 (D.C. Cir. 1982)).

Exemption 7(C) recognizes a "broad privacy interest."  *Archibald v. Dep't of Just.*, 950 F. Supp. 2d 80, 87 (D.D.C. 2013); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 160 (2004) ("[T]he concept of personal privacy under Exemption 7(C) is not some limited or 'cramped notion' of that idea.").  In this vein, "[t]he only relevant public interest in disclosure 'is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contributing significantly to public understanding of the operations or activities of the government.'" *Consumers' Checkbook Ctr. for the Study of Servs. v. Dep't of Health & Hum. Servs.*, 554 F3d 1046, 1051 (D.C. Cir. 2009) (cleaned up; quoting *FLRA*, 510 U.S. at 495).  "[I]nformation about private citizens . . . that reveals little or nothing about an agency's own conduct does not serve a relevant public interest under [the] FOIA."  *Id.* (internal quotations omitted).  "When the subject of [a record] is a private citizen and when the information is in the Government's control as a compilation, rather than as a record of 'what the Government is up to,' the privacy interest protected by Exemption 7(C) is in fact at its apex while the FOIA-based public interest in disclosure is at its nadir."  *Reps. Comm.*, 489 U.S. at 780.  On these bases, the FBI also reasonably

considered that Plaintiff had failed to provide sufficiently compelling evidence showing how disclosure of this type of information or records would benefit the public's understanding of government operations to outweigh Mr. Mayorkas' legitimate and significant privacy interests. *See* Seidel Decl. ¶ 43.

The FBI's reasoning in this case is consistent with other courts within this District finding the same, as was the case in *Archibald v. Dep't of Just.,* 950 F. Supp. 2d 80, 88 (D.D.C. 2013), in which another district court considered whether the FBI's background investigation of former President Obama was exempted from disclosure under Exemption 7(C). In *Archibald*, the district court reached the same conclusion as the FBI did here, that "[u]nder these standards, disclosure of information from the FBI's background check related to President Obama's early life could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id*. And as is the case here, "the information requested by plaintiff concerns" Mr. Mayorkas' "prior status as a private citizen." *Id*. Finally, the district court concluded that as is the case here, former President Obama's background prior to his entry in public life "is unrelated to his performance of his public duties, and whatever sacrifices to his privacy he has made by taking public office do not, under these circumstances, extend to information that the FBI might have compiled[.]" *Id*. This Court should find that consistent with *Archibald* and Exemption 7(C), the FBI reasonably withheld its background investigation of Mr. Mayorkas.

## III.  The FBI Properly Applied Underlying FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E).

In addition to the FBI's categorical withholdings made pursuant to Exemptions 5, 6, and 7(C), and consistent with *Maydak v. Dep't of Just.*, 218 F.3d 760 (D.C. Cir. 2000), the FBI reviewed the underlying information and withheld information based on additional Exemptions,

including Exemptions 1, 3, 5, 6, 7 (C), 7(D), and 7(E).  For the following reasons, the Court should

find that the FBI properly applied the following underlying Exemptions to the withheld records.

### A.    The Withholdings Pursuant to Exemption 1 Are Appropriate.

Exemption 1 protects matters "specifically authorized under criteria established by an

Executive order to be kept secret in the interest of national defense or foreign policy" and is in

"fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  As this Court

has noted:

> FOIA Exemption 1 . . . protects information that is "(A) specifically authorized
> under criteria established by an Executive order to be kept secret in the interest of
> national defense or foreign policy and (B) are in fact properly classified pursuant
> to such Executive order." "Thus, an agency attempting to withhold information
> under Exemption 1 must show that it 'complies with classification procedures
> established by the relevant executive order and withholds only such material as
> conforms to the order's substantive criteria for classification.'"

*Willis v. Nat'l Sec. Agency*, Civ. A. No. 17-2038 (KBJ), 2019 WL 1924249, at *6 (D.D.C. Apr.

30, 2019) (quoting 5 U.S.C. § 552(b)(1)); *Elec. Privacy Info. Ctr. v. Dep't of Just.*, 296 F. Supp.

3d 109, 124 (D.D.C. 2017); *Mobley v. Dep't of Just.*, 870 F. Supp. 2d 61, 66 (D.D.C. 2012).

Moreover, to sustain its Exemption 1 withholdings, the agency's "arguments need only be both

'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security

context." *Schaerr v. Dep't of Just.*, 435 F. Supp. 3d 99, 111 (D.D.C. 2020), *af'd*, 69 F.4th 924

(D.C. Cir. 2023) (quoting *ACLU v. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011)); *Wolf*,

473 F.3d at 374–75; *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("[T]he text of

Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion

that information is properly classified.").

As explained in the Seidel Declaration, FBI determined two categories of information—

file numbers (a classified file number assigned to specific intelligence activities) and acronyms

(classified acronyms that identify specific intelligence methods utilized by the FBI in its

intelligence activities)—would lead to exposure of particular intelligence activities and that the records at issue thus satisfied the requirements of Executive Order 13,526. *See* Seidel Decl. ¶¶ 51-54, 58-61.

Consistent with the Executive Order, the FBI determined that pursuant to Exemption 1, the information withheld pursuant to Exemption 1, is classified and requires a classification marking at the "Secret" level since the unauthorized disclosure of the information reasonably could be expected to cause serious damage to national security. *See id.* ¶ 53. Mr. Seidel also personally verified that the information met the procedural requirements of Executive Order 13526, including that each document was marked as required and stamped with the proper classification designation; each document was marked to indicate clearly which portions are classified and which portions are exempt from disclosure; the prohibitions and limitations on classification specified in the Executive Order were adhered to; the declassification policies set forth in the Executive Order were followed; and any reasonably segregable portions of the classified documents that did not meet the standards for classification under the Executive Order were declassified and marked for release, unless withholding was otherwise warranted under applicable law. *See id.* ¶¶ 53-54.

Executive Order 13,526 exempts intelligence activities (including covert action), intelligence sources and methods, and cryptology from disclosure. *See id.* ¶ 55. In the records at issue, the FBI withheld information pursuant to Exemption 1 to protect intelligence activities and methods utilized by the FBI to gather intelligence. *See id.* ¶ 56. This information is classified because its release would reveal actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations, or disclose the intelligence gathering capabilities of the activities and methods directed at specific targets and because its release would disclose the intelligence gathering capabilities of the activities or

methods directed at specific targets. *See id.* The information concerning the intelligence activities and methods within the records at issue is very specific in nature, provided during a specific period, and known to very few individuals. *See id.*

Further, the information, if disclosed, could reasonably be expected to cause serious damage to the national security for two reasons: (1) disclosure would allow hostile entities to discover the current intelligence gathering activities and methods used by the FBI and (2) disclosure would reveal current targets of specific FBI national security investigations. *See id.* ¶ 57. With the aid of this detailed information, hostile entities could develop countermeasures which would, in turn, severely disrupt the FBI's intelligence gathering capabilities. *See id.* This severe disruption would also result in severe damage to the FBI's efforts to detect and apprehend those who violate national security and criminal laws of the United States. *See id.* As detailed in the Seidel declaration, the disclosure of file numbers and acronyms could be expected to cause serious damage to the national security of the United States. *See id.* ¶¶ 59-61. As such, the FBI properly withheld classified information contained in these records, based on the standards articulated in the FOIA statute, 5 U.S.C. § 552(b)(1).

## B.    The Withholdings Pursuant to Exemption 3 Are Appropriate.

So too for Exemption 3. An Agency may withhold information under Exemption 3 "specifically exempted from disclosure by statute," 5 U.S.C. § 552(b)(3), so long as the statute requires withholding from the public in such a manner as to leave no discretion on the issue or establishes particular criteria for withholding or refers to particular types of matters to be withheld. *See* 5 U.S.C. § 552(b)(3)(A)(i). If the Exemption 3 statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, that statute is required to cite to the FOIA. *Id.* at § 552(b)(3)(B). Here, the exempting statute, the National Security Act of 1947 was passed prior to 2009. Thus, to prevail on summary judgment, the FBI "need only show that the statute claimed is one of

exemption as contemplated by Exemption [3] and that the withhheld material falls within the statute." *Larson*, 565 F.3d at 865; *see also* Seidel Decl. ¶ 63.  The Director of National Intelligence is authorized to establish and implement guidelines for the Intelligence Community for the classification of information under applicable laws, Executive Orders, and other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1).  *See* Seidel Decl. ¶ 64.  In implementing this authority, the Director of National Intelligence promulgated Intelligence Community Directive 700, which provides that Intelligence Community elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure."  *See id*.  The FBI is one of eighteen-member agencies comprising the Intelligence Community, and as such must protect intelligence sources and methods.  *See id*. (citing 50 U.S.C. § 3003(4)).  Given the plain Congressional mandate to protect the Intelligence Community's sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiff.  *See id*. ¶ 65.  Therefore, the FBI is prohibited from disclosing such information under 50 U.S.C. § 3024 (i)(1).  *See id.*

With respect to this exemption, "the Court must defer to the [FBI's] determination because [t]he judiciary 'is in an extremely poor position to second-guess the predictive judgments made by the government's intelligence agencies regarding the risk of disclosure or the harm posed by such disclosure."  *Citizens United v. Dep't of State*, Civ. A. No. 18-1862, 2021 WL 32683835, at *6 (D.D.C. Jul. 29, 2021) (cleaned up).  In this vein, the FBI asserted this Exemption, at times in conjunction with Exemptions 1 and 7(E), to protect information that would reveal intelligence sources and methods.  *See* Seidel Decl. ¶ 66.  Thus, the Court should find that the FBI properly

asserted this exemption to withhold information within the records responsive to Plaintiff's request pursuant to the National Security Act of 1947.

### C.    The Withholdings Pursuant to Exemption 5 Are Appropriate.

Pursuant to Exemption 5, the FBI withheld privileged, deliberative materials consisting of handwritten interview notes.  *See* Seidel Decl. ¶¶ 69-73.  Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption shields documents of the type that would be privileged in the civil discovery context, including materials protected by the attorney-client, attorney work-product, confidential commercial information, and deliberative-process privileges.  *Sears*, 421 U.S. at 149; *Rockwell Int'l*, 235 F.3d at 602.

The handwritten investigative interview notes are inherently part of the deliberative process within the FBI and contain the Special Agents' shorthand notes containing thoughts, ideas, impressions, and interpretations of the verbal interview of a third-party individual, as well as the information conveyed during the interview that the Special Agents determined should be noted for purposes of further analysis and consideration.  *See* Seidel Decl. ¶ 71.  These thoughts, ideas, impressions, interpretations, and information are then fleshed out and distilled during the editorial process for the creation of an official interview report, which the FBI calls a "FD-302."  *See id*.  This official interview report reflects the FBI's final decision regarding the relevance of impressions and information gleaned during the interview.  *See id*.  Special Agents rely heavy on an individual's assistance through interviews and Special Agents must have the freedom to take notes freely and quickly without the fear of release to the public causing an opportunity to distort or misconstrue the words penned.  *See id*. ¶ 72.  As such, the release of the handwritten interview notes would result in foreseeable harm, through having a chilling effect on the Agents' willingness to document their thoughts, impressions, interpretations, and in some instances, investigative

strategies, which is imperative to their ability to prepare the official interview report memorializing the interview and because the release of the handwritten interview notes would reveal the Special Agents' internal deliberations and sorting of a multitude of ideas and at times, investigative strategies. *See id*.

Finally, the release of the handwritten interview notes would also create public confusion as it will reveal information that may not necessarily be included in the final, official interview report. *See id.* The handwritten interview notes predate final agency decisions and until finalized in the official interview report, the notes can change as the document is being edited. *See id.* The handwritten interview notes reflect the give and take of deliberations through the editing process, which leads to final, refined products. *See id.* For these reasons, the Court should find that the FBI's handwritten interview notes are exempt from disclosure under Exemption 5.

### D.    The Withholdings Pursuant to Exemption 6 and 7(C) Are Appropriate.

The FBI also withheld (1) names and other identifying information of FBI Special Agents and professional staff; (2) names and other identifying information of third parties who provided information; (3) names and other identifying information of third parties mentioned; (4) identifying information of a person undergoing a background investigation; (5) names and other identifying information of non-FBI federal government personnel; (6) names and other identifying information of local law enforcement personnel; and (7) names and other identifying information of local government personnel. *See id.* ¶¶ 74-85. As described, *supra*, Exemption 6 permits the withholding of "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Background investigation files maintained by the FBI are "personnel and . . . similar files." *See Hunt*, 935 F. Supp. at 54-55 (finding Exemption 6 applied to records that included, inter alia, information about security clearances). In assessing the applicability of Exemption 6,

courts weigh the "privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy." *Lepelletier*, 164 F.3d at 46; *Chang v. Dep't of Navy*, 314 F. Supp. 2d 35, 43 (D.D.C. 2004). "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier*, 164 F.3d at 47. Exemption 7(C) protects "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The discussion below summarizes the many categories of withholdings made pursuant to Exemption 6 and 7(C) as to keep this memorandum to a reasonable length; however, the Seidel Declaration contains more in-depth justifications and information. *See* Seidel Decl. ¶¶ 74-85.

Names of FBI Special Agents and professional staff were withheld consistent with both Exemptions 6 and 7(C) because publicity, adverse or otherwise, arising from a particular investigation, may seriously prejudice their effectiveness in conducting other investigations or performing their day-to-day work. *See id*. ¶ 76. Further, the publicity associated with the release of a Special Agent's identity in connection with a particular investigation could trigger hostility, and persons targeted by such investigations or those sympathetic to those targeted could seek to inflict violence on a Special Agent. *See id*. Further, there is no public interest served by disclosing the Special Agents' identities because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. *See id*. For similar reasons, the names and identifying information of FBI professional staff were also withheld. *See id*. ¶ 77.

The FBI also withheld the names of third-party individuals who provided information and the names and other identifying information of third parties merely mentioned, consistent with Exemptions 6 and 7(C). *See id*. ¶¶ 78-81. The identifying information of these third parties appears within the files because these individuals willingly divulged information relevant to the FBI's investigative efforts. *See id*. ¶¶ 78, 81. Plaintiff has not provided a privacy waiver authorizing the release of this information. *See id*. ¶ 78. Further, disclosure of these identities of these individuals who willingly provide information could subject these individuals to harassment or embarrassment, undue public attention, or unwanted inquires for information related to their assistance. *See id*. ¶¶ 79, 81. In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure would shed no light on or significantly increase the public's understanding of the FBI's operations or activities. *See id*. ¶¶ 80, 81.

The FBI also withheld identifying information of the candidate for federal employment, Mr. Mayorkas. *See id*. ¶ 82. Releasing the personal identifying information would be considered an unwarranted invasion of his privacy rights, as well as provide important identifiers for individuals involved in personal identity theft. *See id*. In contrast, disclosing Mr. Mayorkas' personal information would not significantly increase the public's understanding of the FBI's performance of its mission. *See id*.

The FBI withheld names and other identifying information of non-FBI federal government personnel, local law enforcement personnel, and names and other identifying information of local government personnel, consistent with Exemptions 6 and 7(C). *See id*. ¶¶ 83-85. The rationale for protecting the identities of these three categories of individuals is the same as the rationale for protecting the identities of FBI employees, and as such, there is significant harm in disclosure which outweighs any public interest because the release of these names would shed no light on the

operations and activities of the FBI.  *See id.* ¶¶ 83-85; 75-77.  For these reasons, the Court should find that the FBI properly withheld these categories of information pursuant to Exemptions 6 and 7(C).

> **E.    The Withholdings Pursuant to Exemption 7(D) Are Appropriate.**

The FBI withheld confidential source information and names and other identifying information of individuals who provided information under an express assurance of confidentiality and information provided pursuant to Exemption 7(D).  *See* Seidel Decl. ¶¶ 86-91.  Exemption 7(D) permits the withholding of "records or information compiled for law enforcement purposes" if producing the records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished" by such a source.  5 U.S.C. § 552(b)(7)(D).  "Exemption 7(D) has long been recognized as affording the most comprehensive protection of all of FOIA's law enforcement exemptions."  *Billington v. Dep't of Just.*, 301 F. Supp. 2d 15, 22 (D.D.C. 2004).  Exemption 7(D) does not require a balancing of public and private interests.  *See*, *e.g., Roth v. Dep't of Just.*, 642 F.3d 1161, 1185 (D.C. Cir. 2011).  It shields "information furnished by a confidential source" to law enforcement authorities during a criminal investigation.  *Fischer v. Dep't of Just.*, 596 F. Supp. 2d 34, 48–49 (D.D.C. 2009).

In determining the applicability of the exemption, "the question is . . . whether the particular source spoke with an understanding that the communication would remain confidential."  *Dep't of Just. v. Landano*, 508 U.S. 165, 172 (1993).  Confidentiality exists, for the purpose of Exemption 7(D), when "the source furnished information with the understanding that the [agency] would not divulge the communication except to the extent the [agency] thought necessary for law enforcement purposes."  *Miller v. Dep't of Just.*, 872 F. Supp. 2d 12, 26 (D.D.C. 2012).

If the production of criminal investigative records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by" such a source, that

ends the matter, and the agency is entitled to withhold the records under Exemption 7(D).  *Parker v. Dep't of Just.*, 934 F.2d 375, 378 (D.C. Cir. 1991).  Once an agency establishes confidentiality of a source, the FOIA requester faces a heavy burden in overcoming that promise.  The requester must come forward with "'absolutely solid evidence showing that the source . . . in a law enforcement investigation has manifested complete disregard for confidentiality.'"  *Id.* (quoting *Dow Jones & Co. v. Dep't of Just.*, 908 F.2d 1006, 1011 (D.C. Cir. 1990)).

Here, FBI protected both confidential source information and names and other identifying information of individuals who provided information under an express assurance of confidentiality.  Numerous confidential sources report to the FBI on a regular basis and provide information under express assurances of confidentiality.  *See* Seidel Decl. ¶ 87.  Similarly, one individual provided information under an express assurance of confidentiality and the information they provided.  *See id*. ¶ 89.  The FBI has learned through experience that sources assisting, cooperating with, and providing information to the FBI must be free to do so without fear of reprisal.  *See id*. ¶ 87.  The release of a source's identity would forever eliminate that source as a future means of obtaining information and any disclosure would have a chilling effect on the activities and cooperation of other sources.  *See id*. ¶ 88.  Similarly, revealing the individual's name who provided information under an express assurance of confidentiality and information provided would inhibit the FBI's access to information critical to FBI investigations.  *See id*. ¶ 90. As such, the Court should find that the FBI reasonably withheld this information pursuant to Exemption 7(D).

## F.    The Withholdings Pursuant to Exemption 7(E) Are Appropriate.

The FBI withheld (1) sensitive investigative file numbers; (2) internal FBI secure fax numbers, non-public intranet web addresses, and telephone numbers; (3) types and timing of investigations; (4) database information and search results; (5) coordination with other government

agencies and state or local law enforcement agencies; and (6) investigative search slips pursuant to Exemption 7(E).  *See* Seidel Decl. ¶¶ 92-109.  Exemption 7(E) permits withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E); *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (noting the "relatively low bar for the agency to justify withholding" information under Exemption 7(E)).

In this Circuit, "'the exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.'" *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)).  In fact, "Exemption 7(E) sets a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'"  *Id.* (cleaned up).  FBI applied Exemption 7(E) to non-public investigative techniques and procedures utilized by FBI to carry-out its law enforcement function, and to non-public details about techniques and procedures that are otherwise known to the public.

The discussion below summarizes the many categories of withholdings made pursuant to Exemption 7(E), as to keep this memorandum to a reasonable length; however, the Seidel

Declaration contains more in-depth justifications and information. The six categories of information withheld by the FBI pursuant to Exemption 7(E) fit squarely within "law enforcement records [which] . . . would disclose techniques and procedures for law enforcement investigations." 5 U.S.C. § 552(b)(7)(E); *see also* Seidel Decl. ¶ 93. Sensitive investigative file numbers are not known to the public and contain three separate portions consisting of FBI file classification numbers, office of origin codes, and numbers assigned to the unique investigative initiatives these files were created to memorialize. *See id.* ¶¶ 95-98. Releasing this information would allow determined criminals and foreign adversaries to obtain an exceptional understanding of the body of investigative intelligence available to the FBI. *See id.* ¶ 98.

Secure fax numbers, non-public intranet web addresses and telephone number could also provide criminals with specific targets for possible cyber-attacks and other attacks on FBI secure communications. *See id.* ¶ 99. Types and timing of investigations, including the types and date of investigations referenced in the records at issue in this case, could enable criminals to time and structure their illegal activities to circumvent the FBI's attempts to enforce federal laws. *See id.* ¶¶ 100-02. The release of database information and search results located through queries of non-public databases used for official law enforcement purposes by the FBI would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations (i.e., the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases) and the nature of their utility to FBI investigators and the scope of information stored within the databases, as well as key information about FBI investigative strategies. *See id.* ¶¶ 103-04. Revealing the coordination with other government agencies and state or local law enforcement agencies pertaining to the records at issue

would reveal the types of investigative data the FBI deems relevant enough to refer to or collaborate with other government agencies or state or local law enforcement agencies for further investigation and would allow criminals to structure their behavior or to avoid investigative triggers that would initiate an investigative referral.  *See id.* ¶ 108.

Finally, the FBI withheld investigative search slips detailing the FBI's file checks for the purpose of identifying subjects in a criminal investigation or national security information. Investigative search slips contain identifying information, including but not limited to, full name, alias, race, sex, weight, height, date of birth, place of birth, social security number, address and locality, telephone number, FBI Number or identifiers specific to the subject-matter or associated with a specific event searched.  *See id.* ¶ 109.  Disclosure of these details could identify classified or sensitive file numbers that reveal the file classification (or type of investigation) and field office location involved with specific investigations and could reveal the number of investigations pertaining to a particular subject or event of investigation to the FBI or law enforcement.  *See id.* For these reasons, the Court should find that the FBI correctly withheld this information pursuant to Exemption 7(E).

## IV.    The FBI Released All Reasonably Segregable Information.

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  Accordingly, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."   *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  But this provision does not require disclosure of records in which the non-exempt information that remains is meaningless.  *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 221 (D.D.C. 2005).  And a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption

cannot be further segregated." *Juarez v. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008). Consistent with this obligation, FBI reviewed the documents responsive to Plaintiff's request and processed the documents to achieve maximum disclosure consistent with the FOIA. *See* Seidel Decl. ¶ 111.

In making its segregability determination, the FBI determined that only 115 pages of public source material could be segregated and released to Plaintiff. *See id.* The remaining responsive records are categorically exempted pursuant to Exemptions 5, 6, and 7(C), as well as pursuant to the underlying Exemptions addressed above. The FBI therefore properly segregated information exempted by FOIA as opposed to information that is not. Because the supporting declaration of Mr. Seidel establishes that all reasonably segregable, non-exempt information has been released, summary judgment should be granted for Defendants. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1107 (D.C. Cir. 2007) (noting "presumption" that agencies complied with the obligation to disclose reasonably segregable material.").

## V.     The FBI Determined that Foreseeable Harm Would Result From Any Disclosure.

As explained previously throughout this memorandum, the FBI reasonably balanced the privacy interest against the public interest in disclosure and in so doing, also considered the foreseeable harm that would flow from any disclosure. *See generally* Seidel Decl. The foreseeable harm analysis requires the identification of the interests protected by the relevant FOIA exemptions. As applicable here, Exemption 7(C) seeks to protect an unwarranted invasion of personal privacy. *See* 5 U.S.C. § 552(b)(7)(C). Similarly, Exemption 6 seeks to protect against disclosure when the disclosure would constitute a clearly unwarranted invasion of personal privacy. *See* 5 U.S.C. § 552(b)(6). In performing the foreseeable harm analysis, context matters. The analysis requires review of the "particular type of material at issue . . . in the specific contest

of the agency action at issue." *Reps. Comm. for Freedom of Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021).

The Seidel declaration describes how disclosure of the information at issue—the background investigation for Mr. Mayorkas—would foreseeably harm the privacy interests at stake. *See generally* Seidel Decl.; *supra*. For each Exemption which carries a foreseeable harm analysis requirement, the FBI considered the privacy interests at stake compared to the public's right to know. On these bases, the FBI reasonably determined that release of identifying information would lead to foreseeable harm.

## CONCLUSION

For these reasons, Defendants request that the Court grant its motion for summary judgment.

Dated: July 26, 2024

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____ */s/ Dedra S. Curteman* _____
DEDRA S. CURTEMAN
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2550

*Attorneys for the United States of America*